Steven L. BESHEAR, in His Official Capacity as the Governor of the Commonwealth of Kentucky; and Mary Lassiter, in Her Official Capacity as State Budget Director, Appellants

v.

HAYDON BRIDGE COMPANY, INC.; Greater Louisville Auto Dealers Association; Kentucky Automobile Dealers Association; M & M Cartage Co., Inc.; Springfield Laundry 86 Dry Cleaners, Inc.; Usher Transport, Inc.; and Kentucky Workers' Compensation Funding Commission, Appellees.

No. 2011–SC–000563–TG.

Supreme Court of Kentucky.

Nov. 21, 2013.

Mark Stephen Pitt, Christopher Wilson Brooker, Counsel for Appellants.

Mark David Guilfoyle, H. Edward O'Daniel, Jr., Counsel for Appellees.

Francis Lee Dickerson, Counsel for Appellee Kentucky Workers' Compensation Funding Commission.

Opinion of the Court by Justice ABRAMSON.

Three years ago in *Beshear v. Haydon Bridge Co., Inc.,* 304 S.W.3d 682 (Ky.2010) (*Haydon Bridge I*), this Court held that provisions of the 2000–2002 and 2002–2004 Budget Bills which suspended annual General Fund appropriations to the Benefit Reserve Fund (BRF) maintained within the Kentucky Workers' Compensation Funding Commission (KWCFC) were constitutional but that other provisions of those bills ordering monies transferred from the BRF to the General Fund and the Department of Mines and Minerals were unconstitutional under Section 51 of

the Kentucky Constitution. This Court reasoned that the monies the legislature had previously appropriated to the BRF and the ongoing private contributions from assessments on workers' compensation insurance premiums were incapable of differentiation, and thus the General Assembly was without authority to transfer any BRF monies to the General Fund absent a statutory amendment and compliance with the publication requirement of Section 51 as set forth in *Commonwealth ex rel. Armstrong v. Collins,* 709 S.W.2d 437 (Ky. 1986). On remand, the trial court granted permanent prospective relief prohibiting the future transfer of funds from the BRF to the General Fund or any other state agency, and also ordered "retroactive injunctive relief" in the form of a judgment requiring Defendants Governor Steven L. Beshear and State Budget Director Mary E. Lassiter to return any and all monies that had been transferred from the BRF to the General Fund in the decade from 2000–2010. The trial court's order addressed not only transfers from the part of the BRF known as the Special Fund but also the Coal Workers' Pneumoconiosis Fund, a separate fund maintained by KWCFC pursuant to Kentucky Revised Statutes (KRS) 342.1241 and .1242 and the focus of new claims brought by Plaintiffs in their Third Amended Complaint. Finally, the trial court held that the Plaintiffs had created a common fund through this litigation and, consequently, their attorneys were entitled pursuant to KRS 412.070 to a 25% contingency fee ($8,778,-725.00) to be paid by the Commonwealth of Kentucky.

This Court accepted transfer of the ensuing appeal pursuant to Kentucky Rule of Civil Procedure (CR) 74.02. Defendants/Appellants Beshear and Lassiter (collectively "the Governor") maintain that sovereign immunity and the separation of powers provisions of the Kentucky Constitution preclude the "retroactive injunctive relief" ordered by the trial court, relief that in essence is an award of damages against the Commonwealth. They also maintain that because no common fund can be created in this case there is no basis for the attorneys' fee award against the Commonwealth. Finally, they contend that the Pneumoconiosis Fund claims should not have been addressed by the trial court since none of the Plaintiffs has standing, never having been subject to the assessments which support that Fund and having no interest in it. Agreeing with the Governor on all of these issues, we reverse the Judgment of the Franklin Circuit Court.

## RELEVANT FACTS

### I. The Original Suit and *Haydon Bridge I.*

In December 2003 and February 2004, respectively, Plaintiffs Haydon Bridge Company, Inc., Greater Louisville Auto Dealers Association, Kentucky Automobile Dealers Association, M & M Cartage Co., Inc., Springfield Laundry & Dry Cleaners, Inc. and Usher Transport, Inc. (Plaintiffs) filed first a Petition for Declaration of Rights and Injunctive Relief and later a First Amended Petition against then-Governor Paul Patton and Acting State Budget Director Mary Lassiter. Plaintiffs challenged the Governor's budget reduction plan and corresponding parts of the 2000–2002 and 2002–2004 Budget Bills that affected the Special Fund portion of the BRF. The Special Fund, originally created in 1946, is addressed in KRS 342.122 and is funded through two sources, appropriations by the General Assembly and assessments against workers' compensation premiums paid by Kentucky employers such as the Plaintiffs. The original and First Amended Petitions (and an eventual Second Amended Petition naming then-Gover-

nor Ernie Fletcher) sought a declaration that provisions in the aforementioned budget bills, which (1) temporarily suspended an annual $19 million appropriation from the General Fund to the KWCFC and (2) ordered transfers out of the Special Fund to either the General Fund or the Department of Mines and Minerals, were unconstitutional. The trial court invalidated all of the challenged budget provisions under Section 51 of the Kentucky Constitution.

As noted above, this Court found suspension of the appropriations to be constitutional under Sections 15 and 51 of the Kentucky Constitution[1] but agreed with Plaintiffs that transfer of funds *out of the Special Fund*[2] was unconstitutional. This Court reasoned that KRS 342.1227 prohibited funds in the possession of KWCFC from being transferred or loaned to the Commonwealth for any purpose other than those authorized by KRS Chapter 342. While the General Assembly in KRS 48.310(2) and 48.315 provided that a budget bill could be used to transfer KWCFC funds back to the General Fund, those transfers were necessarily limited by this Court's holding in *Armstrong v. Collins*, 709 S.W.2d at 437. *Armstrong* held that the legislature had no authority, via a budget bill, to transfer back to the General Fund any agency funds in which legislative appropriations and private contributions were commingled and not subject to differ-

entiation. In *Haydon Bridge I*, we concluded that monies in the Special Fund could not be differentiated and thus the attempted statutory suspension of KRS 342.1227 was improper under Section 15 of the Kentucky Constitution; in fact, a statutory amendment was necessary, necessitating compliance with the publication requirement of Section 51. Because there was no compliance with Section 51, the challenged transfers from the agency funds to the General Fund and the Department of Mines and Minerals were unconstitutional.

## II. The Trial Court's Orders on Remand and This Appeal.

On remand, Plaintiffs were allowed to file a Third Amended Complaint challenging provisions in the 2004–2006, 2006–2008 and 2008–2010 Budget Bills that were similar to those held unconstitutional in *Haydon Bridge I* and adding new claims regarding provisions in budget bills dating back to 2000 which pertain to the Pneumoconiosis Fund. The Pneumoconiosis Fund was created in 1996 for the benefit of coal industry workers whose last exposure occurred on or after December 12, 1996 and is funded solely by "employers engaged in the severance or processing of coal." KRS 342.1242. The funding comes from an assessment on the workers' compensation premiums paid by the coal industry em-

---

1. Section 15 provides: "No power to suspend laws shall be exercised unless by the General Assembly or its authority."

 Section 51 provides: "No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title, and *no law shall be revised, amended, or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revised, amended, extended or conferred, shall be reenacted and published at length."* The emphasized portion of this section is referred to as the "publication requirement."

2. In *Haydon Bridge I*, the Court referred to the Benefit Reserve Fund (BRF) as the focus of the Plaintiffs' claims but, in fact, all of their petitions addressed only the Special Fund portion of the BRF created under KRS 342.122. The separate Pneumoconiosis Fund created in KRS 342.1241 and .1242 was not the subject of Plaintiffs' claims until the filing of an Third Amended Petition in June 2010, following this Court's *Haydon Bridge I* opinion. The effect of *Haydon Bridge I* on the Pneumoconiosis Fund is discussed more fully below.

ployers and a per ton assessment on coal severed by those entities engaged in coal severance. *Id.* The challenged budget bill provisions transferred monies from the Pneumoconiosis Fund to the Office of Mine Safety and Licensing. In their Third Amended Complaint, Plaintiffs once again characterized the relief sought as declaratory and injunctive relief. The injunctive relief was partially "retroactive" in that it sought the return of all funds transferred out of the Special Fund from 2000–2010 and out of the Pneumoconiosis Fund in the same timeframe. Plaintiffs also sought prospective injunctive relief as to upcoming transfers from the Pneumoconiosis Fund for the 2010–2012 biennium.

Over numerous objections from the Governor, detailed below, the trial court granted retroactive injunctive relief as to both Funds and prospective relief as to both Funds. As for the Pneumoconiosis Fund, an earlier restraining order had halted a planned transfer from that Fund to the Office of Mine Safety and Licensing as provided for in the 2010–12 Budget Bill. That temporary order became permanent when the trial court issued its August 16, 2011 permanent injunction. The trial court also granted attorneys' fees to the Plaintiffs' counsel, finding that their efforts had created a "common fund" that benefited other Kentucky employers who paid assessments to the KWCFC and reasoning that 25% of that common fund should be awarded as fees pursuant to KRS 412.070.

After the trial court entered judgment, the KWCFC Director of Fiscal Operations filed an affidavit establishing that the amounts transferred either to the General Fund or the Department of Mines and Minerals from 2000–2010 totaled $32,781,000.00. The Director did not differentiate between the Special Fund and Pneumoconiosis Fund, referring to them collectively as the Benefit Reserve Fund.

However, the Director did note that a scheduled transfer from "the Benefit Reserve Fund of coal workers pneumoconiosis funds in the amount of $1,904,000 to the Department of Mines, Safety and Licensing" did not occur "due to orders issued by Franklin Circuit Court enjoining such transfer."

The Governor appealed the grant of prospective injunctive relief as to the intended transfers from the Pneumoconiosis Fund and the retroactive relief regarding transfers made from 2000–2010. Having accepted transfer from the Court of Appeals, the trial court's judgment is before us for review in all respects except as to the permanent prospective injunctive relief prohibiting transfers from the Special Fund, relief that the Governor concedes is consistent with the directive of this Court in *Haydon Bridge I.*

## *ANALYSIS*

### I. Sovereign Immunity Precludes the Monetary Relief Ordered by the Court.

As we recently noted in *Caneyville Volunteer Fire Dept. v. Green's Motorcycle Salvage, Inc.,* 286 S.W.3d 790, 799 (Ky.2009), sovereign immunity is a common law doctrine, a "bedrock component" of American government, which prohibits claims "against the government treasury absent the consent of the sovereign." In *Reyes v. Hardin County,* 55 S.W.3d 337, 338–39 (Ky.2001), this Court succinctly described the interplay between the doctrine and Sections 230 and 231 of our Kentucky Constitution:

[Sovereign immunity] was first recognized by our predecessor Court without question or citation to authority in *Divine v. Harvie,* 23 Ky. (7 T.B. Mon.) 439 (1828): 'It seems to be conceded on all hands, that the State cannot be made a

party defendant, and is not suable in her own courts.' *Id.* at 441. The words 'sovereign immunity' are not found in our Constitution. However, Section 230 provides that "[n]o money shall be drawn from the State Treasury, except in pursuance of appropriations made by law ...;" and Section 231 provides that '[t]he General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth.' Virtually identical provisions were contained in the Constitutions of 1792 (Article VIII, §§ 3, 4), 1799 (Article VI, §§ 5, 6), and 1850 (Article VIII, §§ 5, 6). Although some cases suggest that Sections 230 and 231 are the source of sovereign immunity in Kentucky, *e.g., Bach v. Bach,* Ky., 288 S.W.2d 52, 54 (1956), those sections are more accurately viewed as delegating to the General Assembly the authority to waive the Commonwealth's inherent immunity by direct appropriation of money from the state treasury and/or by specifying where and in what manner the Commonwealth may be sued.

Just as the State Auditor and State Treasurer could not be sued in lieu of the Commonwealth in *Divine v. Harvie* to obtain a garnishment against the State Treasury, several decades later this Court held that a suit demanding funds held in the State Treasury could not be maintained under the pretext of a suit against the treasurer. *Tate v. Salmon,* 79 Ky. 540, 543 (Ky.1881). Sovereign immunity is an indisputable limitation on the power of the judiciary. As noted in *Withers v. University of Kentucky,* 939 S.W.2d 340, 344 (Ky. 1997), a "court has no right to merely refuse to apply it or abrogate the legal doctrine."

The Governor insists that the relief ordered by the trial court is a latter day effort to ignore sovereign immunity under the pretext of a retroactive injunction while Plaintiffs insist that the retroactive injunction flows as the obvious remedy for the constitutional violations identified in *Haydon Bridge I.* Despite the current diametrically opposed positions on the most recent trial court orders, there is no question that Plaintiffs' declaratory and injunctive claims, as originally pled, did not impinge on sovereign immunity.

■ The Commonwealth, in this case represented by the Governor, is clearly subject to a traditional declaratory judgment action. As this Court noted in *Philpot v. Patton,* 837 S.W.2d 491, 493 (Ky. 1992), any suggestion that the Commonwealth was immune from lawsuits seeking a declaration "that the General Assembly ... has acted or failed to act in a constitutional manner" was "put ... to rest" by *Rose v. Council for Better Education, Inc.,* 790 S.W.2d 186 (Ky.1989), the landmark public education case.

*Rose* held the General Assembly is not immune from suit in a declaratory judgment action to decide whether the General Assembly has failed to carry out a constitutional mandate and that members of the General Assembly are not immune from declaratory relief of this nature simply because they are acting in their official capacity. *Rose* held a declaratory judgment over constitutionality is not limited to deciding the constitutionality of statutes, but extends to failure to enact statutes complying with constitutional mandate. While it would be a violation of the separation of powers doctrine in the Kentucky Constitution, Sections 27 and 28, for our Court to tell the General Assembly what to do, *i.e.,* what system or rules to enact, it is our constitutional responsibility to tell them whether the system in place complies with or violates a constitutional mandate, and, if it violates the constitu-

tional mandate, to tell them what is the constitutional "minimum." But by its very nature, judicial exercise of this responsibility requires great restraint. 837 S.W.2d at 493–94.

■■■ Three years earlier, in *Armstrong*, 709 S.W.2d 437, the 1986 case which pitted the Attorney General against Governor Martha Layne Collins, the Secretary of the Finance Cabinet and the State Treasurer in a dispute over provisions in the biennial budget bill passed in 1984, the trial court had temporarily restrained transfers from certain "trust and agency" funds. Although the trial court subsequently concluded the transfers were constitutional, this Court later reversed the trial court's legal conclusion in part, *i.e.*, some of the transfers were deemed constitutional while others were unconstitutional, but there was no directive that the improperly transferred funds be restored. Because *Armstrong* was critical to *Haydon Bridge I*, its central holding bears repeating:

. [T]he General Assembly has, constitutionally speaking, the power in a budget bill to *repeal* or *amend* the manner in which public funds are used. Ky. Const. Sec. 51, the "title" section, has not been violated by the matters clearly relating to appropriations. What we decide is simply that the transfers of funds which are merely temporary, determinable suspensions of the operation of the statutes relating to appropriations of public funds are within the legislative authority as set out in SB 294 and Ky. Const. Sec. 51, the amendment section.

However, the transfers of funds which relate to appropriations of private contributions cannot be termed suspensions or modifications of the operation of the statutes. Because the General Assembly has no authority to transfer private funds to the general fund, the transfer of money from agencies in which public funds and private employee contributions are commingled, and cannot be differentiated, is unconstitutional.

709 S.W.2d at 446 (emphasis in original). The *Armstrong* Court identified state retirement plans such as the Kentucky Employees Retirement System and the Teachers' Retirement System as well as the "Workers' Compensation and Workers' Claim Special Fund" as examples of state agencies with commingled funds. *Id.* at 446–47. "The employee contributions and the insurance company assessments constitute private, mandatory donations."[3] *Id.* at 447.

In the case before us, the Governor has not appealed the portion of the trial court's order which would enjoin prospective transfers from the Special Fund to the General Fund or other state agencies. Indeed, the law of the case in *Haydon Bridge I* would require that very result. The only part of the court's prospective injunctive relief that is before us relates to enjoining transfers from the Pneumoconiosis Fund, and the basis of the Governor's appeal is Plaintiffs' alleged lack of standing, a matter discussed below. Thus, the retroactive injunctive relief is really the centerpiece of this dispute.

■■■ Sovereign immunity is both broad and exacting and if the sovereign has not waived immunity or consented to suit an injunction is foreclosed in most circumstances. One recognized exception identified in *Board of Trustees of the Univ.*

---

**3.** Notably, these commingled funds were used to fund Kentucky public employees' pensions, in the case of the retirement systems, and workers' compensation payments, with regard to the other mentioned funds. All of the funds were created for the benefit of private individuals as opposed to general governmental purposes.

*of Ky. v. Hayse,* 782 S.W.2d 609 (Ky.1989) *overruled on other grounds by Yanero v. Davis,* 65 S.W.3d 510 (Ky.2001), derives from *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Pursuant to the *Young* exception, a federal court may grant prospective injunctive relief against a state officer to compel compliance with federal law, whether constitutional or statutory. However, the exception is not applicable to an action directly against the state or state agency, only against a state officer, and it cannot be used to compel a state officer to comply with state law. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Frew ex rel. Frew v. Hawkins,* 540 U.S. 431, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). As discussed below, however, prospective injunctive powers are available to Kentucky courts in cases such as this and those powers include both temporary relief pending a declaration of unconstitutionality under the Kentucky Constitution as well as permanent relief in a final judgment. With those general observations, we turn to the trial court's grant of retroactive injunctive relief.

Plaintiffs insist that the retroactive injunctive relief awarded by the trial court is a "remedy that flows inexorably from this Court's declaration of constitutional wrong in *Haydon Bridge [I]* " and is not barred by sovereign immunity. They contend that the refund provisions of KRS 45.111 apply to waive sovereign immunity in these circumstances; sovereign immunity only protects the "public purse" and the KWCF funds are not state money; the injunctive relief ordering repayment is not an award of money damages; and Section 242 of the Kentucky Constitution waives immunity when private property is improperly taken by the Commonwealth. Having considered each of these theories,

we conclude that none of them overcomes or displaces sovereign immunity.

**A. KRS 45.111 and *Ross v. Gross.***

 KRS 45.111 provides:

Any funds received into the State Treasury which are later determined not to be due to the state may be refunded to the person who paid such funds into the Treasury. The Finance and Administration Cabinet may issue a warrant to disburse the funds upon a request from the budget unit that originally received and deposited the funds. The request for refund must be approved by the head of the budget unit or his designated assistant. The Finance and Administration Cabinet may require any documentation deemed necessary.

On its face, the statute contemplates that the budget unit that received funds "not ... due to the state" will process a refund request through the Finance and Administration Cabinet. Although this statute appears never to have been cited in a published Kentucky case, an obvious example of the statute at work would be the refund of an overpayment of a state licensing fee. In this case, Plaintiffs' workers' compensation insurance premiums were lawfully subject to assessment pursuant to KRS 342.122 and those assessments were literally "due to the state" with the designated agency recipient being the KWCFC, "an agency of the Commonwealth [created] for the public purpose of controlling, investing, and managing the funds collected pursuant to KRS 342.122." KRS 342.1223. Thus, there is no credible argument that KRS 45.111 applies to these facts. For the statute to apply, the funds would have to "not ... be due to the state" (and they are legally due) and the refund would have to be due to the paying party (in this case the Plaintiffs) but there is no request, nor could there be, that the funds be restored to private parties. Instead, Plaintiffs re-

quest restoration of the funds to the BRF; in short, they are requesting an intra-governmental transfer from the General Fund back to the BRF.

A case relied on by the trial court, *Ross v. Gross*, 300 Ky. 337, 188 S.W.2d 475 (1945), predated KRS 45.111 but addressed the same concept, *i.e.*, refund of monies not due the state. That case involved fees and receipts collected by the Harlan County jailer, county court clerk and sheriff and remitted to the State Treasury pursuant to a statute applicable to counties having a population of more than 75,000 people. The Harlan County officials remitting these fees were to be paid their salaries through the State Treasury. When it was later determined that Harlan County had fewer than 75,000 residents and the statute did not apply, the monies were ordered refunded on the ground that payment into the State Treasury did not vest the state with right or title since the monies "belonged" at all times to Harlan County. 188 S.W.2d 475. The *Ross* Court opined that the "true owner" of money placed in the Treasury need not "await the pleasure of the Legislature in order to recover that which [has] been adjudged by a Court of competent jurisdiction to have

been at all times his own." *Id.* Notably, the concept of sovereign immunity does not appear to have been raised in *Ross,* but equally importantly, as in KRS 45.111, the refund concept is one applicable when a person pays monies into the State Treasury that are not owed to the state. Again, Plaintiffs' assessments were lawfully owed to the Commonwealth through its statutorily-created agency, the KWCFC, and this case is not seeking a refund to private payors (or to county officials, as in *Ross* ) but rather restoration of monies to a particular state agency fund.[4]

Recognizing that they are not seeking return of their own assessments but rather return of Fund monies to the KWCFC, Plaintiffs characterize those monies as private funds held in trust, a premise for which no authority is cited and which is not borne out by review of KRS Chapter 342. While there are undoubtedly restrictions on the use of Fund monies, *e.g.*, KRS 342.1227, there is no reference in the statute to the creation of a "trust." Moreover, although the KWCFC is required to "act as a fiduciary" in exercising its power over the funds collected, KRS 342.1223(2)(b), that does not make KWCFC monies a trust corpus.[5] Finally, *Haydon Bridge I*

**4.** Plaintiffs cite several out-of-state cases in support of their position but each is readily distinguishable. *Bill Stroop Roofing, Inc. v. Metropolitan Dade County,* 788 So.2d 365, 366 (Fla.Ct.App.2001), involved licensing fees "illegally extracted" in violation of a state statute and *River Fleets, Inc. v. Carter,* 990 S.W.2d 75 (Mo.Ct.App.1999), involved surcharge fees wrongfully collected for an underground storage tank insurance fund. In *Santos v. Ohio Bureau of Workers' Compensation,* 101 Ohio St.3d 74, 801 N.E.2d 441 (2004), addressing improperly collected subrogation fund fees, the court held that the employers were entitled to restitution, *i.e.*, to have restored to them the funds in the defendant's possession that had been improperly collected and that rightfully belonged to the employers. All three cases involved monies that were

improperly collected and thus not due the governmental body that held them. These cases are obviously comparable to refunds sought under KRS 45.111 for monies "not ... due the state." Here, Plaintiffs' workers' compensation premium assessments were indisputably lawfully assessed and this case is not about having those funds restored to the employers but rather about how the legislative branch subsequently dealt with a fund that contained those private assessments as well as funds appropriated from the General Fund.

**5.** Interestingly, KRS 342.1224 provides that members of the board of directors of the KWCFC "are hereby determined to be officers and agents of the Commonwealth of Kentucky and, as such, shall enjoy the same immunities from suit for the performance of their official

held that Special Fund monies could not be transferred to the General Fund through the challenged budget bill provisions because it was impossible to differentiate the source of the funds held—funds appropriated by the legislature, employers' assessments or investment income. 304 S.W.3d at 704–05. In short, there was a commingling of public and private monies in the account of a Kentucky governmental agency. To now deem those agency funds exclusively private would not only be contrary to the statute but contrary to the facts on which this Court based its legal conclusions in *Haydon Bridge I*.

In sum, while the refund provisions of KRS 45.111 constitute a limited waiver of sovereign immunity, that statute applies to funds not "due to the state" and the funds at issue here were literally due to the Commonwealth through a state agency, KWCFC. As for *Ross v. Gross*, it never addressed sovereign immunity so it is impossible to know if the issue was raised but, in any event, it too applies to funds that are not due the State Treasury. In the end, Plaintiffs focus on the KWCFC Funds as the "refund" sought (not their own individual assessments), an issue that is best addressed in the context of their "public purse" argument.

### B. The Public Purse.

 Sovereign immunity protects public coffers or, as it is sometimes denominated, the public purse. The parties have contested whether the essence of the challenged transfers is, as the Governor maintains, merely an intra-governmental transfer between accounts (the BRF to the General Fund) held by the State Treasury. Plaintiffs maintain the monies at issue are not part of the State Treasury and therefore not part of the public purse. This argument ties closely to the prior argument that the monies to be refunded never really belonged to the Commonwealth.

 Clearly, KRS 45.253(3) provides that "agency accounts," which KWCFC monies would be, are to be deposited with the State Treasury. The State Treasurer's Annual Reports for 2001 through 2010, available at http://finance.ky.gov confirm that the KWCFC's BRF is part of the State Treasury. Plaintiffs counter that KWCFC funds can be and are invested in equity securities, KRS 342.1223(2)(b), an investment prohibited to the State Treasury. Even so, it is inescapable that the Funds managed by the KWCFC are public agency funds. KRS 342.122;.1223;.1224. Our holding in *Haydon Bridge I* simply established that within the Special Fund it is impossible to differentiate the *source* of given monies, *i.e.*, whether derived from legislative appropriations, assessments or investment income. To the extent we referred to monies as "private agency funds," that denomination was not intended to suggest that the state agency in charge, the KWCFC, had no control over those funds or that the funds were exclusively private but rather that they were strictly controlled by statute and included "private mandatory donations" as referenced in *Armstrong*.[6] Again, the issue in

---

acts as do other officers of the Commonwealth of Kentucky."

**6.** Plaintiffs offer *Wisconsin Medical Society, Inc. v. Morgan*, 328 Wis.2d 469, 787 N.W.2d 22 (2010) as directly analogous to this case but it is factually and legally distinguishable. There the Injured Patients and Families Compensation Fund was created as part of a statutory scheme that constitutes the exclusive

source of recovery for a person claiming malpractice by a health care provider in Wisconsin. Providers are required to purchase malpractice coverage and then pay an annual assessment on their premiums to the Fund which in turn pays any malpractice award or settlement that exceeds the provider's own insurance coverage. By statute, the Fund is an *irrevocable trust* held for the benefit of

*Haydon Bridge I* was not that the relevant provisions of KRS Chapter 342 could never be changed by the General Assembly to re-purpose any portion of the commingled public monies managed by the KWCFC but that the statutes could not be changed through the suspension powers recognized in Section 15 of our Constitution.[7] 304 S.W.3d at 704–05.

## C. Retroactive Injunctive Relief.

 In an effort to avoid the sovereign immunity doctrine, Plaintiffs insist that their requested retroactive injunctive relief is not a disguised request for damages but a proper remedy for the state's unconstitutional transfers of KWCFC monies. In response, the Governor maintains that a retroactive injunction is an oxymoron, injunctive relief being exclusively a prospective remedy. In fact, the law, albeit infrequently, recognizes a form of retroactive injunction more aptly referred to as a "reparative injunction," "[a]n injunction requiring the defendant to restore the

plaintiff to the position that the plaintiff occupied before the defendant committed a wrong." Black's Law Dictionary (9th ed.2009). The term appears rarely in American jurisprudence but whatever its vitality in other contexts, it has no role in this case due to the Commonwealth's sovereign immunity. Almost forty years ago, in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the United States Supreme Court explained this very point in the Eleventh Amendment context. The Eleventh Amendment, of course, recognizes that states joining the Union did not surrender their sovereign immunity.[8]

In *Edelman,* a class of individuals who were entitled to benefits under a joint federal and state program known as Aid to the Aged, Blind, and Disabled (AABD), brought suit alleging that Illinois officials were violating federal law and denying equal protection by not complying with federal law time limits within which AABD

---

health care providers and claimants. It is *purely privately* funded. Thus, the Wisconsin Supreme Court, in a 5–2 decision, concluded that sweeping the Fund of $200 million for the benefit of an indigent care fund was an unconstitutional taking of the health care providers' property interests in the Fund. This case does not involve an irrevocable trust and it is not about exclusively private assessments but rather commingled funds. *See also Tuttle v. New Hampshire Medical Malpractice Joint Underwriting Ass'n,* 159 N.H. 627, 992 A.2d 624 (2010) (Fund for the payment of medical malpractice awards could not be used to supplement state's General Fund; the Fund was purely privately funded and was not a state agency).

7. The concurring in result opinion suggests that the majority, in discussing *Haydon Bridge I,* intimates that private assessments can be lawfully taken by the legislature for General Fund purposes. Respectfully, that proposition is not expressly or impliedly stated anywhere in this Opinion and certainly is not intended.

8. "Dual sovereignty is a defining feature of our Nation's constitutional blueprint." States, upon ratification of the Constitution, did not consent to become mere appendages of the Federal Government. Rather, they entered the Union "with their sovereignty intact." An integral component of that "residuary and inviolable sovereignty," retained by the States is their immunity from private suits.... States, in ratifying the Constitution, did surrender a portion of their inherent immunity by consenting to suits brought by sister States or by the Federal Government. Nevertheless, the Convention did not disturb States' immunity from private suits, thus firmly enshrining the principle in our constitutional framework.

\* \* \* \* \* \*

[T]he Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity. *Federal Maritime Comm. v. S. Carolina State Ports Authority,* 535 U.S. 743, 751–53, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002) (internal citations omitted).

applications were to be processed. They sought and secured both declaratory and injunctive relief from the federal district court. The court not only granted prospective injunctive relief requiring future compliance with federal time limits but also ordered Illinois state officials to "release and remit AABD benefits [that had been] wrongfully withheld" from individuals who were later determined to be eligible. 415 U.S. at 656, 94 S.Ct. 1347. The United States Court of Appeals for the Seventh Circuit affirmed, rejecting Illinois officials' argument that the Eleventh Amendment precluded retroactive monetary relief.

In reversing, the U.S. Supreme Court noted that while the Eleventh Amendment only literally precludes the federal courts from entertaining a suit "against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," that Court has long recognized that "an unconsenting State is immune from suits brought in federal courts by her own citizens" as well as citizens of other states or foreign nationals. 415 U.S. at 662–63, 94 S.Ct. 1347. The *Edelman* Court further noted that "(W)hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Id.*, citing *Ford Mtr. Co. v. Dept. of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945). Explaining the distinction between the prospective and the retroactive portions of the injunction entered by the district court, the Supreme Court stated:

Ex parte Young was a watershed case in which this Court held that the Eleventh Amendment did not bar an action in the federal courts seeking to enjoin the Attorney General of Minnesota from enforcing a statute claimed to violate the Fourteenth Amendment of the United States Constitution.

* * * * *

But the relief awarded in *Ex parte Young* was prospective only; the Attorney General of Minnesota was enjoined to conform his future conduct of that office to the requirement of the Fourteenth Amendment. Such relief is analogous to that awarded by the District Court in the prospective portion of its order under review in this case.

But the retroactive position of the District Court's order here, which requires the payment of a very substantial amount of money which that court held should have been paid, but was not, stands on quite a different footing. These funds will obviously not be paid out of the pocket of petitioner Edelman.

* * * * *

The funds to satisfy the award in this case must inevitably come from the general revenues of the State of Illinois, and thus the award resembles far more closely the monetary award against the State itself, *Ford Motor Co. v. Department of Treasury, supra,* than it does the prospective injunctive relief awarded in *Ex parte Young.*

415 U.S. at 664–65, 94 S.Ct. 1347. Moreover, the plaintiffs' labeling of monies to be paid out of the state treasury as "equitable restitution" was not sufficient to avoid the Eleventh Amendment and the concept of sovereign immunity.

But that portion of the District Court's decree which petitioner challenges on Eleventh Amendment grounds goes much further than any of the cases cited. It requires payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation to those whose

applications were processed on the slower time schedule at a time when petitioner was under no court-imposed obligation to conform to a different standard. While the Court of Appeals described this retroactive award of monetary relief as a form of 'equitable restitution,' it is in practical effect indistinguishable in many aspects from an award of damages against the State. It will to a virtual certainty be paid from state funds, and not from the pockets of the individual state officials who were the defendants in the action. It is measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials.

415 U.S. at 668, 94 S.Ct. 1347. Not surprisingly, the *Edelman* court held the retroactive portion of the injunction that ordered payment of AABD funds, which should have been paid earlier in accordance with federal time lines, was barred by the Eleventh Amendment, *i.e.*, Illinois's sovereign immunity precluded that draw on the Illinois treasury. *See also Native Village of Noatak v. Blatchford,* 38 F.3d 1505, 1512 (9th Cir.1994) ("In discerning whether the relief sought is prospective or retroactive for purposes of the Eleventh Amendment bar, we must analyze the substance, not the form;" an injunction directing the state to pay the amount previously improperly withheld from a Native Alaskan village is retroactive relief barred by the Amendment and sovereign immunity as construed in *Edelman.).*

Here, the retroactive injunctive relief sought by Plaintiffs would require the Commonwealth to withdraw monies from the General Fund, an action the Commonwealth has not consented to through waiver of its sovereign immunity.[9] Although the monies drawn would not be distributed directly to private individuals (as requested in *Edelman* ) or to a municipality (as requested in *Native Village),* they would be placed in a specific state agency account, a restricted agency account that contains commingled public and private funds used for workers' compensation benefits to injured workers. We see no relevant difference in the retroactive injunctive relief ordered here and that disallowed in *Edelman* and *Native Village*—all of these retroactive orders impinge on sovereign immunity because they require monetary relief that can only be satisfied by draws on a state's treasury.

**D. Section 242 and the Taking of Private Property.**

■ Finally, Plaintiffs invoke Section 242 [10] of the Kentucky Constitution, enti-

9. It bears repeating that these funds are commingled public monies appropriated by the legislature and private assessments required by statute. Thus, the funds Plaintiffs seek are not even quantifiable in terms of the percentage to which Kentucky employers can accurately claim to be the source of the monies. *Haydon Bridge I*, 304 S.W.3d at 705 ("Mathematical calculations ... cannot identify the actual source of every dollar ... as there were no directories in the budgets.... In short, year end balances cannot be separated into categories called 'public money' and 'private agency funds.' ").

10. Section 242 provides: Municipal and other corporations, and individuals invested with the privilege of taking private property for public use, shall make just compensation for property taken, injured or destroyed by them; which compensation shall be paid before such taking, or paid or secured, at the election of such corporation or individual, before such injury or destruction. The General Assembly shall not deprive any person of an appeal from any preliminary assessment of damages against any such corporation or individual made by Commissioners or otherwise; and upon appeal from such preliminary assessment, the amount of such damages shall, in all cases, be determined by a jury, according to the course of the common law.

tled "Just compensation to be made in condemning private property—Right of appeal—Jury trial." This provision has no application to these facts. As its title implies, it has been used almost exclusively to assure "just compensation" in the "condemning [of] private property" for public use. As already noted, the amounts which the Plaintiffs paid on their workers' compensation premiums were lawfully assessed and those assessments became part of the Special Fund portion of the BRF pursuant to law. There was no taking of private property without just compensation. Instead, this lawsuit is about whether the General Assembly dealt lawfully, constitutionally, with the commingled monies in the Special Fund after those funds were either lawfully appropriated from the General Fund or lawfully collected from Kentucky employers.

In sum, sovereign immunity bars the retroactive monetary relief ordered by the trial court regardless of whether it is labeled a retroactive injunction, equitable restitution, or some other type of remedy. KRS 45.111 and *Ross v. Gross,* along with Section 242 of the Kentucky Constitution, are simply inapplicable to this dispute. The funds at issue are clearly part of the "public purse" and, although subject to statutory restrictions, they are not purely private funds as the Plaintiffs attempt to characterize them. This last point brings us to the Governor's second ground for deeming the trial court's order erroneous and unsustainable, namely the separation of powers.

## II. The Constitutional Separation of Powers Precludes the Courts' Ordering the Requested Transfer of Funds From the General Fund to the BRF as Retroactive Relief.

Section 27 of the Kentucky Constitution provides that the powers of government "shall be divided into three distinct departments, and each of them confined to a separate body of magistracy." The legislative, executive and judicial branches of our state government are to operate within their respective spheres and "no person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others" except as expressly directed or permitted by the Constitution. Ky. Const., § 28. Focusing on these two provisions, this Court has often noted that "Kentucky is a strict adherent to the separation of powers doctrine." *Diemer v. Commonwealth of Ky., Transp. Cab.,* 786 S.W.2d 861, 864 (Ky.1990). As we stated in *Legislative Research Comm. v. Brown,* 664 S.W.2d 907 (Ky.1984):

> Our present constitution contains explicit provisions which, on the one hand, *mandate* separation among the three branches of government, and on the other hand, specifically *prohibit* incursion of one branch of government into the powers and functions of the others. Thus, our constitution has a double-barreled, positive-negative approach.

*Id.* at 912 (emphasis in original). Not surprisingly, almost a century ago, Kentucky's then-highest court stated "perhaps no state forming part of the ... United States has a constitution whose language more emphatically separates and perpetuates what might be termed the American tripod form of government than does ... [the Kentucky] Constitution." *Sibert v. Garrett,* 197 Ky. 17, 246 S.W. 455, 457 (1922).

The Governor invokes the separation of powers doctrine, correctly we find, as another bar to the trial court's order that $32,781,000.00 be transferred from the General Fund to the BRF. The Kentucky Constitution is not only clear about the separation of powers among the three

branches of government, it is also exceedingly clear that the State Treasury is solely under the control of the legislative branch. Section 230 states, in pertinent part, that "[n]o money shall be drawn from the State Treasury, except in pursuance of appropriations made by law." In *Armstrong*, while addressing issues virtually identical to those presented here, we stated unequivocally: "It is clear that the power of the dollar—the raising and expenditure of the money necessary to operate state government—is one which is within the authority of the legislative branch of government." 709 S.W.2d at 441. Clearly, we are without authority to invade the province of the General Assembly by ordering that funds be drawn from the General Fund and deposited to another governmental account, the BRF.

To order monetary relief in this case would create a perfect storm, an unprecedented collision of the constitutional powers accorded the three separate branches of government. The judiciary would be ordering the executive branch (the legislative branch not being before us) to remove more than $32 million from the General Fund and to transfer it to the KWCFC's Benefit Reserve Fund. Notably, some portion of that $32 million transferred from the BRF *was general state revenues that came from the General Fund to begin with*—hence our finding in *Haydon Bridge I* of commingled state appropriations and private assessments.[11] If that money was removed from the General Fund, the General Assembly's planned appropriations would necessarily be affected because there would be insufficient funds. Of course, there is no authority for the Governor unilaterally spending public funds or

allocating them other than as determined by the General Assembly. *Fletcher v. Commonwealth*, 163 S.W.3d 852, 871 (Ky. 2005) ("The Governor possesses no 'emergency' or 'inherent' power to appropriate money from the state treasury that the General Assembly, for whatever reason, has not appropriated.... Nor does the Court of Justice have the power to confer such authority."). Presumably, the Governor would then have to exercise his power to call an emergency session of the General Assembly. Ky. Const., § 80. In short, the legislative branch would be convening at the direction of the executive branch to determine how to deal with the situation, to-wit, how to pay what the judicial branch says the sovereign owes, all while continuing the necessary functions of state government. The impact of this hypothetical sequence of events one time is concerning but the potential future consequences are almost unfathomable. The General Assembly would be routinely summoned into special session by the Governor in order to pay "bills" emanating from court judgments following litigation over budget bills.[12]

▆▆▆ The enormity of this scenario illustrates why the judicial branch's declaration of unconstitutionality does not translate into monetary relief unless the General Assembly has expressly authorized it. *See, e.g.*, KRS 134.590 (allowing refund of taxes "paid under a statute held unconstitutional."). To the suggestion that a judicial declaration of unconstitutionality without a concomitant power to order retroactive monetary relief is meaningless, the response is clear. Injunctive relief is available *to restrain* an unconstitutional exercise of legislative or executive power.

---

11. Thus, any court order would be directing, in part, the spending of general state revenues not attributable in any way to assessments on Plaintiffs or Kentucky employers generally.

12. Of course, sovereign immunity prevents this very occurrence. The sovereign is not responsible for those court-ordered liabilities unless immunity has been waived.

*Akers v. Floyd Co. Fiscal Court,* 556 S.W.2d 146, 149 (Ky.1977) ("Injunctive processes of law are available to be invoked in an action challenging the constitutionality of a legislative act and of the carrying out or enforcement of its provisions.") In *Smothers v. Lewis,* 672 S.W.2d 62, 64 (Ky.1984) this Court upheld an injunction issued against the Department of Alcoholic Beverage Control stating:

> Once and for all [we] make clear that a court, once having obtained jurisdiction of a cause of action, has, as an incidental to its constitutional grant of power, inherent power to do all things reasonably necessary to the administration of justice in the case before it. In the exercise of this power, a court, when necessary in order to protect or preserve the subject matter of the litigation, to protect its jurisdiction and to make its judgment effective, may grant or issue a temporary, injunction in aid of or ancillary to the principal action.

*See also Legislative Research Commission v. Fischer,* 366 S.W.3d 905 (Ky.2012).

■ Plaintiffs themselves acknowledged this principle when they sought and successfully obtained an injunction prohibiting an impending transfer from the Pneumoconiosis Fund. The injunctive powers, quite simply, are how the judiciary accords relief in these ·circumstances, not by invading sovereign immunity, not by stretching its powers to reach the State Treasury and thereby order a withdrawal from the General Fund after the fact, no matter how fitting that might appear. Here, the vast majority of the approximately \$32 million at issue was transferred *after* this suit was filed in December 2003. From the inception of this litigation, Plaintiffs alleged entitlement to injunctive relief but, crucially, they did not pursue it.[13] With one exception,[14] they never secured a ruling on any request to enjoin the transfer of funds until August 10, 2010, months after *Haydon Bridge I,* when a planned transfer of \$1,904,000.00 from the Pneumoconiosis Fund to the Department of Mines was halted by a temporary injunction order of the Franklin Circuit Court.

■ Our ruling does not in any way restrict, surrender or, as it has been colorfully expressed, "gut" judicial authority. Very plainly, the judicial branch cannot give up something it never had. Under our tripartite form of government, the courts have never had the power to draw on the State Treasury without the legislature's consent in circumstances such as those before us.[15] Ky. Const., §§ 27, 28,

---

**13.** Plaintiffs note that the trial court denied their motion for injunctive relief on April 27, 2005. It appears this was a denial of an *ex parte* restraining order. There was no further action by Plaintiffs at that time but after receiving declaratory relief in their favor upon entry of summary judgment on June 30, 2006, they subsequently moved for CR 65 injunctive relief. Plaintiffs complain that no ruling was ever made on their request for an injunction but it is axiomatic that a party requesting relief is charged with obtaining a ruling on the request. *See Hannah v. Commonwealth,* 306 S.W.3d 509 (Ky.2010). *See also Commonwealth, Dept. for Nat. Resources v. Maynard,* 537 S.W.2d 169 (Ky.1976) (request for injunctive relief in complaint insufficient; plaintiff must file motion and seek hearing).

**14.** The one exception is the aforementioned *ex parte* restraining order, which the trial court denied.

**15.** We hasten to add that this Court has the inherent power to act when the executive or legislative branch is not fulfilling an obligation under the Kentucky Constitution. Thus, in *Rose v. Council for Better Education,* 790 S.W.2d at 186, this Court held the legislature had not fulfilled its constitutional obligation with respect to providing an efficient system of public education. Fulfilling that critical governmental obligation required the spending of public funds and the separation of powers doctrine was no bar. to this Court requiring the General Assembly to meet its constitutional responsibility. This case is,

230. But indisputably, the courts do have and have readily exercised the enormous power of the injunction in suits alleging the unconstitutionality of legislative acts. This power extends to embargoing funds by temporary injunction and, if a statute is ultimately held unconstitutional, declaring as much and permanently enjoining the unconstitutional use of those funds. Here, the right to injunctive relief was alleged by Plaintiffs but they never followed through to secure a ruling. The separation of powers provisions in our Kentucky Constitution, as well as sovereign immunity, manifestly prohibit the monetary relief they now seek.

### III. Plaintiffs' Attorneys' Fees are Not Recoverable.

The trial court's award of more than $8 million in attorneys' fees to Plaintiffs' counsel was premised on KRS 412.070.[16] The Governor attacks this award on several grounds but we need only address one. The statute does not apply. KRS 412.070, by its terms, only applies when an attorney's work on behalf of his client results in a common fund that will benefit other parties in interest. The attorneys' fee is to "be paid out of the funds recovered before distribution." Here, no funds are recoverable against the Commonwealth and, consequently, no attorneys' fee is awardable under KRS 412.070.

### IV. Plaintiffs Do Not Have Standing to Challenge the Pneumoconiosis Fund Transfers.

■ The final issue is the trial court's August 10, 2010 temporary injunction, later converted to a permanent injunction, which prohibits the transfer of funds from the Pneumoconiosis Fund to the Office of Mine Safety and Licensing. As previously noted, the Pneumoconiosis Fund was created in 1996 and is funded solely by assessments on the workers' compensation premiums of coal producers and by assessments on coal production on a per ton basis. KRS 342.1242. This Fund covers black lung benefits for Kentucky coal workers who were last exposed on or after December 12, 1996. *Id.* Because none of the Plaintiffs is involved in coal production, none of them has ever contributed to this Fund. Accordingly, the Governor maintains that there was no party with standing before the court when the Franklin Circuit Court granted temporary or permanent injunctive relief as to the Pneumoconiosis Fund. On this standing point, the Governor is correct.

■ As this Court recently noted in *Tax Ease Lien Investments 1, LLC v. Commonwealth Bank & Trust*, 384 S.W.3d 141, 143 (Ky.2012), for a party to have standing to bring an action it is imperative that the party have a "present or substantial" interest in the matter litigated and not simply a "mere expectancy." In the

---

manifestly, not about legislative failure to fund a constitutionally imposed obligation and this Court is not in any way suggesting that in a case of that kind the Court is powerless to require compliance with our Kentucky Constitution.

16. KRS 412.070 provides in pertinent part:
　　(1) In actions for the settlement of estates, or for the recovery of money or property held in joint tenancy, coparcenary, or as tenants in common, or for the recovery of money or

property which has been illegally or improperly collected, withheld or converted, if one (1) or more of the legatees, devisees, distributees or parties in interest has prosecuted for the benefit of others interested with him, and has been to trouble and expense in that connection, the court shall allow him his necessary expenses, and his attorney reasonable compensation for his services, in addition to the costs. This allowance shall be paid out of the funds recovered before distribution.

realm of constitutional challenges, the rule was most concisely stated in *Merrick v. Smith*, 347 S.W.2d 537, 538 (Ky.1961): "It is an elementary principle that [the] constitutionality of a law or its application is not open to challenge by a person or persons whose rights are not injured or jeopardized thereby." Indeed, "in addressing various constitutional challenges . . ., Kentucky courts have long adhered to a strict injury-in-fact requirement." *Commonwealth Nat. Res. and Environ. Protection Cabinet v. Kentec Coal Co., Inc.*, 177 S.W.3d 718, 732 (Ky.2005) (J. Cooper, concurring in part and dissenting in part). *See also Steel v. Meek*, 312 Ky. 87, 226 S.W.2d 542, 543 (1950) (constitutional challenge to statute governing absentee voting procedures on grounds that it made no provisions for absentee voting by the blind, the illiterate, or the disabled, dismissed for lack of standing where appellant failed to show that he, himself, was prejudiced by the alleged discrimination).

Given the clarity of Kentucky precedent, it is quite obvious that Plaintiffs, having never contributed to the Pneumoconiosis Fund in any way, have no standing to claim injury by virtue of the transfer of monies from that Fund to the Office of Mine Safety. Plaintiffs maintain that they have standing in the classic sense because "all Kentucky employers have been burdened for years paying the cost of black lung disease," a premise which the trial court found compelling. However, the Pneumoconiosis Fund is a statutory creation and it very specifically provides benefits only to those coal workers last exposed on or after December 12,1996 and receives funds only from employers involved in coal production by virtue of an assessment on workers' compensation insurance premiums and on each ton of coal severed in the Commonwealth. Coal workers whose last exposure was before December 12, 1996 receive their pneumo-

coniosis benefits from the Special Fund, a fund in which Plaintiffs do have an interest. But the Pneumoconiosis Fund and the Special Fund are two separate statutory funds and the judiciary is not free to ignore that fact.

As a further ground for standing, Plaintiffs note that KRS 342.1231 provides that "[s]ubsequent administrative savings as a result of the implementation of 1996 (1st Extra. Sess.) Ky. Acts ch. 1 shall be used to defray the special fund assessment on all employers in the Commonwealth." The trial court read this statute to mean that any "temporary excess monies" in the Pneumoconiosis Fund could be used for the benefit of employers who pay into the Special Fund. While KRS 342.1231 is rather cryptic, "administrative savings" is certainly not synonymous with "temporary excess monies." But more significantly, on its face KRS 342.1232 requires that "administrative savings" resulting from the implementation of HB 1 of the 1996 Extraordinary Session of the General Assembly, a 65–page bill that overhauled Kentucky's workers' compensation system, be used to defray Special Fund assessments on Kentucky employers. The Pneumoconiosis Fund was only one part of HB 1 and there is absolutely nothing in KRS 342.1232 that ties "administrative savings" in the Pneumoconiosis Fund to reduced costs for employers contributing to the Special Fund. Even if that leap could be made, the potential administrative savings would be a mere expectancy not the present and substantial interest necessary to establish standing. *Tax Ease Lien Investments*, 384 S.W.3d at 143.

In any event, the record includes a certified September 2009 Actuary Report prepared for the KWCFC which provides a "Liability Analysis and Determination of Assessment" that dispels the trial court's supposition. The Special Fund and Pneu-

moconiosis Fund are dealt with separately in the Actuary Report and the surplus in the Pneumoconiosis Fund quite clearly is used for the benefit of that Fund, reducing the future assessment rates on coal producers rather than Kentucky employers generally. There is no basis, in the language of KRS 342.1232 or the practice of the KWCFC, for tying the Special Fund and Pneumoconiosis Funds together as Plaintiffs have attempted to in order to create standing.

Although Plaintiffs do not have standing on this claim, they maintain that in *Haydon Bridge I* this Court addressed the issue of transfers out of the Pneumoconiosis Fund because we referred to transfers from the BRF (Benefit Reserve Fund), which includes both the Special Fund and the Pneumoconiosis Fund. While Plaintiffs are correct about the nomenclature used, it is quite clear that only the Special Fund was truly at issue in *Haydon Bridge I*. No coal producers (the only contributors to the Pneumoconiosis Fund) were parties to that appeal and, as a consequence, claims about the handling of the Pneumoconiosis Fund were not even raised until the Third Amended Petition was filed in the trial court following the remand in *Haydon Bridge I*. Perhaps most illustrative of the fact that the Pneumoconiosis Fund was not at issue is the fact that the transfers that were held unconstitutional in *Haydon Bridge I* were deemed so because public monies appropriated by the General Assembly could not be differentiated from assessments collected from private employers, *i.e.*, there was a comingling of public tax monies and private assessments. 304 S.W.3d at 704–05. The Pneumoconiosis Fund has no funds appropriated by the General Assembly but consists entirely of assessments on the workers' compensation premiums of "employers engaged in the severance or processing of coal" and on each ton of coal severed by "every entity engaged in the severance of coal." KRS 342.1242. These monies are "private, mandatory" assessments as referred to in *Armstrong v. Collins*, 709 S.W.2d at 447. While Plaintiffs may have no standing as to the Pneumoconiosis Fund, the teachings *of Armstrong v. Collins* with respect to the handling of private assessments through budgetary bill suspensions are quite clear.

## CONCLUSION

The retroactive injunctive relief ordered by the trial court violates sovereign immunity and the separation of powers laid out in the Kentucky Constitution. Because no common fund was recovered in this litigation, there was also no basis for the trial court's award of attorneys' fees pursuant to KRS 412.070. Finally, Plaintiffs have no standing with regard to the Pneumoconiosis Fund so the trial court should not have enjoined transfers from that Fund based on a request from these Plaintiffs. Accordingly, the appealed portions of the February 18, 2011 and August 16, 2011 Opinions and Orders of the Franklin Circuit Court are reversed.

MINTON, C.J.; KELLER, NOBLE, and VENTERS, JJ., concur. SCOTT, J., concurs in result only by separate opinion in which CUNNINGHAM, J., joins.

SCOTT, J., concurring in result only.

Although I agree with the majority opinion in most regards, I concur in result only because of the majority's overbroad assertion that:

Again, the issue in *Haydon Bridge I* was not that the relevant provisions of KRS Chapter 342 could never be changed by the General Assembly to repurpose any portion of the commingled public monies managed by the KWCFC but that the statutes could not be changed through the suspension powers recognized in

Section 15 of our Constitution. 304 S.W.3d at 704–05.

I believe this statement is somewhat overly broad, which, therefore, makes it misleading in one respect. I say this because *Haydon Bridge I*, 304 S.W.3d at 704, was crafted under the directions of *Commonwealth ex rel. Armstrong v. Collins*, 709 S.W.2d 437 (Ky.1986). Thus, we plainly noted that:

> *Armstrong* dictates that "the General Assembly has *no* authority to transfer private funds to the general fund." *Id.* at 446 (emphasis added). Thus, it would not tolerate *any* transfer that would or might include private agency funds. There is simply no authority to transfer private agency funds such as these, to other funds in our budget.

*Haydon Bridge I*, 304 S.W.3d at 705.

Referring to various comingled "public and private" retirement funds, as well as insurance company assessments paid by workers' compensation employers, including those to the Special Fund—the only entities then existing for workers' compensation purposes—*Armstrong* clearly stated:

> However, the transfers of funds which relate to appropriations of private contributions cannot be termed suspensions or modifications of the operation of the statutes. Because the General Assembly has no authority to transfer private funds to the general fund, the transfer of money from agencies in which public funds and private employee contributions are commingled, and cannot be differentiated, is unconstitutional. Diversions from the Kentucky Employees Retirement System, County Employees Retirement System, State Police Retirement System, and Teachers' Retirement System fall within this category, as do Workers' Compensation and Workers' Claims Special Fund. The employee con-

tributions and the insurance company assessments constitute private, mandatory donations. To the extent that private funds were transferred, we reverse.

709 S.W.2d at 446–47 (footnote omitted).

The Pneumoconiosis Fund is such a fund-operating entirely on "private, mandatory donations" or assessments. *Id; see also* KRS 342.1242(3). And, although

> "taxes undoubtedly include assessments, and the right to impose assessments has its foundation in the taxing power of the government …, in practice and as generally understood, there is a broad distinction between the two terms. Taxes,' as the term is generally used, are public burdens imposed generally upon the inhabitants of the whole state, or upon some civil division thereof, for governmental purposes, without reference to peculiar benefits to particular individuals or property. 'Assessments,' have reference to impositions for improvements and which are specially beneficial to particular individuals or property, and which are imposed in proportion to the particular benefits supposed to be conferred. They are justified only because the improvements conferred special benefits and are just only when they are divided and proportioned to such benefits."

*Haydon Bridge I*, 304 S.W.3d at 697–98(*quoting Blacks Law Dictionary* 1629 (rev'd 4th ed.1968)).

Having noted the above, I agree, however, that the amounts at issue here cannot be recovered in this instance for reasons as noted by the majority's opinion. I do not agree, however, that the taking of private assessments, even if loosely termed "public monies," may ever be lawfully used at the biennial whim of the legislature for general fund purposes. Ky. Const.

§§ 59(15), 60, 71, and 180. Thus, I concur in result only.

CUNNINGHAM, J., joins.