RENDERED: AUGUST 14, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0229-DGE

AMELIA LONG, INDIVIDUALLY AND ON BEHALF     APPELLANTS
OF A CLASS OF OTHERS SIMILARLY SITUATED;
KAREN DEVIN, INDIVIDUALLY AND ON BEHALF
OF A CLASS OF OTHERS SIMILARLY SITUATED;
KAREN SAMSON; RICHARD HARDY, II,
INDIVIDUALLY AND ON BEHALF OF A CLASS OF
OTHERS SIMILARLY SITUATED; AND TABITHA
MARCUM, INDIVIDUALLY AND ON BEHALF OF A
CLASS OF OTHERS SIMILARLY SITUATED

ON REVIEW FROM COURT OF APPEALS
V.                     NO. 2023-CA-0398
FRANKLIN CIRCUIT COURT NO. 18-CI-00627

COMMONWEALTH OF KENTUCKY,     APPELLEES
DEPARTMENT OF REVENUE; MARK METCALF,
IN HIS OFFICIAL CAPACITY AS KENTUCKY
STATE TREASURER; PENNY COX IN HER
OFFICIAL CAPACITY AS TREASURER,
UNIVERSITY OF KENTUCKY; AND UNIVERSITY
OF KENTUCKY

AND

2024-SC-0230-DGE

COMMONWEALTH OF KENTUCKY,     APPELLANT
DEPARTMENT OF REVENUE

ON REVIEW FROM COURT OF APPEALS
V.                     NO. 2023-CA-0411
FRANKLIN CIRCUIT COURT NO. 18-CI-00627

AMELIA LONG, INDIVIDUALLY AND ON BEHALF OF A CLASS OF OTHERS SIMILARLY SITUATED; KAREN DEVIN, INDIVIDUALLY AND ON BEHALF OF A CLASS OF OTHERS SIMILARLY SITUATED; KAREN SAMSON; PENNY COX IN HER OFFICIAL CAPACITY AS TREASURER, UNIVERSITY OF KENTUCKY; RICHARD HARDY, II, INDIVIDUALLY AND ON BEHALF OF A CLASS OF OTHERS SIMILARLY SITUATED; TABITHA MARCUM, INDIVIDUALLY AND ON BEHALF OF A CLASS OF OTHERS SIMILARLY SITUATED; AND UNIVERSITY OF KENTUCKY

APPELLEES

AND

2024-SC-0231-DG

KIMBERLY BENNETT; BENJAMIN LANE; RONNIE LESTER, INDIVIDUALLY; AND SAYRE LAWRENCE

APPELLANTS

V.

ON REVIEW FROM COURT OF APPEALS
NO. 2022-CA-1276
FRANKLIN CIRCUIT COURT NO. 18-CI-00975

KENTUCKY COMMUNITY & TECHNICAL COLLEGE SYSTEM; DEPARTMENT OF REVENUE; MARK METCALF, KENTUCKY STATE TREASURER; MARY FISTER-TUCKER IN HER OFFICIAL CAPACITY; MARY FISTER-TUCKER, IN HER OFFICIAL CAPACITY AS CHIEF FINANCIAL OFFICER; MOREHEAD STATE UNIVERSITY; PENNY COX IN HER OFFICIAL CAPACITY; SUSAN KRAUSS, IN HER OFFICIAL CAPACITY AS UNIVERSITY TREASURER; TODD J. KILBURN, IN HIS OFFICIAL CAPACITY AS VICE PRESIDENT & CHIEF FINANCIAL OFFICER FOR KCTCS; AND UNIVERSITY OF KENTUCKY

APPELLEES

AND

2024-SC-0240-DG

COMMONWEALTH OF KENTUCKY,                          APPELLANT
DEPARTMENT OF REVENUE


                    ON REVIEW FROM COURT OF APPEALS
V.                        NO. 2022-CA-1321
                    FRANKLIN CIRCUIT COURT NO. 18-CI-00975


KIMBERLY BENNETT; BENJAMIN LANE; RONNIE          APPELLEES
LESTER, INDIVIDUALLY; AND SAYRE
LAWRENCE

AND


                        2024-SC-0243-DG

KENTUCKY COMMUNITY & TECHNICAL                   APPELLANTS
COLLEGE SYSTEM AND TODD J. KILBURN, IN
HIS OFFICIAL CAPACITY AS VICE PRESIDENT &
CHIEF FINANCIAL OFFICER FOR KCTCS


                    ON REVIEW FROM COURT OF APPEALS
V.                        NO. 2022-CA-1276
                    FRANKLIN CIRCUIT COURT NO. 18-CI-00975


SAYRE LAWRENCE; BENJAMIN LANE;                   APPELLEES
DEPARTMENT OF REVENUE; KIMBERLY
BENNETT; MARK METCALF, KENTUCKY STATE
TREASURER; MARY FISTER-TUCKER, IN HER
OFFICIAL CAPACITY AS CHIEF FINANCIAL
OFFICER; MOREHEAD STATE UNIVERSITY;
RONNIE LESTER, INDIVIDUALLY; SUSAN
KRAUSS, IN HER OFFICIAL CAPACITY AS
UNIVERSITY TREASURER; AND UNIVERSITY OF
KENTUCKY

3

**OPINION OF THE COURT BY JUSTICE BISIG**

**AFFIRMING IN PART, REVERSING IN PART, AND REMANDING**

These interlocutory appeals arise from two cases filed in Franklin Circuit Court. In the first case (the Medical Case), the plaintiffs[1] allegedly owed debts to the University of Kentucky (UK) incurred as a result of medical treatment provided at UK's medical facilities. In the second case (the Education Case), the plaintiffs allegedly owed debts to UK, Morehead State University, or the Kentucky Community & Technical College System (KCTCS) incurred as a result of educational services provided by those institutions. In both cases, the plaintiffs filed suit alleging that these institutions unlawfully referred their debts under certain inapplicable statutes to the Kentucky Department of Revenue (Department) for collection, and that the Department unlawfully collected the debts under those statutes.

The Franklin Circuit Court has preliminarily ruled in both cases that the Department was not statutorily authorized to collect the debts. The Circuit Court has also certified the Medical Case to proceed as a class action. However, those issues and rulings are not before this Court today. Rather, in these interlocutory appeals we are asked to consider only whether the defendants are entitled to sovereign immunity.

---

[1] Because this consolidated matter consists of five separate appeals, some of the parties are both Appellants and Appellees before this Court, depending on the particular appeal. For ease of reference, we will simply refer to the parties as plaintiffs or defendants, consistent with their role in the proceedings before the Franklin Circuit Court.

The Franklin Circuit Court concluded in both cases that sovereign immunity does not apply. In two separate Opinions, the Court of Appeals affirmed in part and reversed in part, holding in each that while the defendants do not have sovereign immunity against claims for purely declaratory relief, they do have sovereign immunity against all claims for monetary relief.

We agree with the Court of Appeals that sovereign immunity does not bar plaintiffs' requests for purely declaratory relief. We also partially agree that sovereign immunity bars plaintiffs' claims for monetary relief—at least to the extent plaintiffs seek a refund of funds that were due to the state, even if unlawfully or improperly collected. However, we disagree that sovereign immunity bars plaintiffs' claims for monetary relief in the form of a refund of funds that were never due to the state. We therefore affirm the Court of Appeals in part, reverse in part, and remand to the Franklin Circuit Court.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Medical Case[2]

The plaintiffs in the Medical Case (the Medical Plaintiffs) are all persons allegedly owing debt to UK incurred as a result of medical services provided at UK's medical facilities. Prior to 2008, UK collected such debts the same as any other private creditor would have. That is, UK pursued informal and third-party collection avenues and, if those failed, it then sought a court judgment to collect the debt.

---

[2] The Medical Case is Civil Action No. 18-CI-00627 in Franklin Circuit Court, and gives rise to interlocutory appeals No. 2024-SC-0229-DGE and No. 2024-SC-0230-DGE in this Court.

In 2008, however, UK began to utilize a different procedure for medical debt collection. As before, UK would first attempt to collect the debt informally or through a third-party debt collector. However, when those efforts proved unsuccessful, UK would then refer the debt to the Department for collection. UK contends it was authorized to make such referrals by KRS 45.237, 45.238, and 45.241 (collectively, the "Collection Statutes"). Generally speaking, these Collection Statutes allow state agencies to refer certain unpaid debts to the Department for collection, and authorize the Department to use its tax collection powers to collect those debts.

The Collection Statutes authorize the Department to add interest and a 25% collection fee to referred debts. Upon referral of medical debt by UK, the Department would add these amounts to the unpaid bill. The Department then utilized a number of its delinquent tax collection tools under KRS Chapter 131 to collect the debt, including garnishment of wages and bank accounts, withholding of tax refunds, and filing of liens against real and personal property. In some cases, the debtor also entered into a voluntary payment plan with the Department.

The Medical Plaintiffs contend that in some instances, the Department's collection actions were the first notice to a debtor that anything was owed. In contrast, UK asserts it engaged in a number of efforts to collect the debt before referring it to the Department. More particularly, UK contends it first sent statements to the debtors, and thereafter referred unpaid accounts to a third-party debt collector. When that collector's efforts proved unsuccessful, the

6

collector would send a final "Letter 8" to the debtor informing him or her of the right to contest the debt and the procedure to do so. The Letter 8 also informed the debtor that if a contest was not filed, the debt would be referred to the Department for collection. While neither UK nor the Department obtained a court judgment against the debtor before utilizing the statutory collection practices, the Department contends an administrative hearing process, including an opportunity for judicial appeal, was available to the debtors. The Department asserts none of the Medical Plaintiffs pursued their right to contest or administratively challenge the debt collection.

The Medical Plaintiffs contend the Department and UK used these collection practices to collect tens of millions of dollars from more than 20,000 patients. Notably, in 2022 the General Assembly enacted legislation that now prohibits the Department from utilizing the Collection Statutes for the collection of consumer health care debt.

In 2018 the Medical Plaintiffs filed a Complaint in Franklin Circuit Court against UK, UK's Treasurer, the Department, and the Commonwealth's State Treasurer. In their Complaint, the Medical Plaintiffs assert that UK unlawfully referred their alleged debts to the Department for collection and that the Department unlawfully used the Collection Statutes to collect those debts.[3] The Medical Plaintiffs seek a declaration that the Department's collection efforts are unlawful and an unconstitutional taking, as well as monetary relief in the form of a refund of funds collected by the Department.

---

[3] The Medical Plaintiffs also challenge various aspects of UK's billing practices.

7

On August 15, 2022, the Franklin Circuit Court granted partial judgment on the pleadings, agreeing that the Collection Statutes do not authorize the Departments' collection of the Medical Plaintiffs' debt. More specifically, the Circuit Court concluded that KRS 45.237 and 45.238 only permit Department collection of improper payments made by a state agency to a third party, and that KRS 45.241 only permits Department collection of debts that have been reduced to judgment. The Circuit Court thus concluded the Collection Statutes were inapplicable to the Medical Plaintiffs' alleged debt because that debt was not the result of an improper agency payment, and had not been reduced to judgment. That ruling is not at issue in this interlocutory appeal.

The Circuit Court further held that the defendants do not have sovereign immunity against the plaintiffs' claims. It reasoned that because the Department did not have authority to collect the debt, the funds at issue never vested in the Commonwealth, and thus the Commonwealth could not assert sovereign immunity against a claim for a refund of those funds.

No defendant appealed from the trial court's sovereign immunity ruling within the 30-day timeframe set forth in CR 73.02(1)(a).[4] The Medical Plaintiffs then moved for class certification. The defendants opposed certification, with the Department specifically raising sovereign immunity as one of the bases for its objection. On March 28, 2023, the Circuit Court granted class certification.

---

[4] The present Rules of Appellate Procedure became effective January 1, 2023, and thus did not govern appeals at the time of the Franklin Circuit Court's sovereign immunity ruling. On January 1, 2023, RAP 3 replaced our former CR 73.02. However, like CR 73.02, RAP 3(A)(1) generally sets forth a 30-day window for the filing of a notice of appeal.

UK and the Department each filed an interlocutory appeal of the trial court's class certification ruling within ten days as required under CR 23.06, with the Department also stating in its Notice of Appeal its intention to appeal not only class certification but also the trial court's denial of sovereign immunity.

In considering the appeals, the Court of Appeals first addressed the question of sovereign immunity as necessary to determine whether the trial court even had authority to rule in the case and certify it as a class action. The Court of Appeals concluded that all of the Medical Plaintiffs' claims for monetary relief were barred by sovereign immunity (including monetary relief disguised as declaratory relief), but that their remaining requests for declaratory relief were not barred by sovereign immunity. The Court of Appeals then found that the trial court did not abuse its discretion in certifying the case as a class action.[5]

## II.    Education Case[6]

The underlying facts, claims, and issues in the Education Case are similar to those in the Medical Case, with the difference being that the debt at issue was incurred for educational rather than medical services. In the Education Case, the plaintiffs (the Education Plaintiffs) are persons who allegedly owe education-related debt to UK, Morehead State University, or

---

[5] The merits of the lower courts' rulings regarding class certification are not at issue here, as the parties have presented no argument on that matter to this Court. We therefore leave undisturbed the Court of Appeals' ruling on that issue.

[6] The Education Case is Civil Action No. 18-CI-00975 in the Franklin Circuit Court, and gives rise to interlocutory appeals No. 2024-SC-0231-DG, No. 2024-SC-0240-DG, and No. 2024-SC-0243-DG in this Court.

KCTCS. The Education Plaintiffs filed suit against those institutions, as well as various institution officers, the Department, and the Kentucky State Treasurer, in Franklin Circuit Court.

As in the Medical Case, the Education Plaintiffs allege these educational institutions unlawfully referred their unpaid debt under the Collection Statutes to the Department for collection, and that the Department unlawfully utilized collection practices allowed under the Collection Statutes to collect that debt.[7] As in the Medical Case, the Education Plaintiffs allege the Department's collection efforts were in some instances the first notice they had of any alleged outstanding debt, while the defendants maintain they provided notice of both the debt and an administrative and judicial appeal process to the plaintiffs. As in the Medical Case, the Education Plaintiffs allege these collections occurred without any court judgment against them. And as in the Medical Case, the Education Plaintiffs seek both a declaration that the collections were unlawful and a refund of funds taken by the Department. The Department asserts the amount of funds at issue exceeds $100 million.

The defendants filed a motion to dismiss the Education Case, which the Franklin Circuit Court denied. The Circuit Court concluded first that the Collection Statutes did not authorize the Department to collect the plaintiffs' debts. As in the Medical Case, the Circuit Court reasoned that KRS 45.241 applies only to a debt reduced to judgment, and thus did not apply to the

---

[7] Unlike the Medical Case, there has been no statutory amendment prohibiting the Department from collecting education-related debts owed to state agencies.

10

Education Plaintiffs' debt because no judgments had been obtained regarding that debt.[8] That ruling is not at issue in this interlocutory appeal.

As to sovereign immunity, the Franklin Circuit Court held that KRS 131.565 and 131.570 waive sovereign immunity against a claim for wrongful withholding of a tax refund, and that KRS 45.111 waives sovereign immunity against a claim for return of funds improperly paid into the State Treasury. Finally, the Circuit Court also held that defendants have no sovereign immunity against the plaintiffs' takings claim.

The defendants filed an interlocutory appeal of the trial court's sovereign immunity ruling within the 30-day window set forth under then-applicable CR 73.02(1)(a).[9] Thus, sovereign immunity was the sole issue considered by the Court of Appeals. Its holding was similar to its holding on that issue in the Medical Case. That is, the Court of Appeals held that sovereign immunity bars all of the plaintiffs' claims for monetary relief (including monetary relief disguised as declaratory relief). The Court of Appeals concluded that neither KRS 131.565, KRS 131.570 nor KRS 45.111 waives that immunity. And as in

---

[8] Interestingly, Judge Wingate's reasoning in the Education Case included one notable difference from his ruling in the Medical Case. As noted above, Judge Wingate held in the Medical Case that KRS 45.237 and 45.238 apply only to a state agency's attempts to recover payments it has improperly made to a third party. In contrast, Judge Wingate held in the Education Case that KRS 45.237 and 45.238 are not limited to such debts but also allow recovery of other debts owed to a state agency. However, Judge Wingate ultimately concluded, as in the Medical Case, that the Collection Statutes nonetheless did not apply because the Education Plaintiffs' debts had not been reduced to judgment. In any event, we need not resolve this discrepancy as the underlying merits of the plaintiffs' claims are not at issue in this interlocutory appeal.

[9] As noted above, the general 30-day window for the filing of a notice of appeal is now found in RAP 3(A)(1).

the Medical Case, the Court of Appeals concluded that sovereign immunity did not bar plaintiffs' remaining claims for purely declaratory relief.

Parties to both the Medical Case and the Education Case filed a number of motions seeking discretionary review from this Court. We granted those motions and, given the identity of the legal issues raised in the appeals, consolidated the matters for oral argument which we heard on March 13, 2025.

## ANALYSIS

The issue of whether a party is entitled to sovereign immunity is a question of law. *Benningfield v. Fields*, 584 S.W.3d 731, 737 (Ky. 2019). Therefore, we review a lower court's rulings regarding sovereign immunity de novo. *Id.*

Before proceeding to consider the merits of the sovereign immunity issues raised here, however, we must first address two preliminary matters: first, whether the Court of Appeals erred in addressing sovereign immunity in the course of the Medical Case interlocutory appeal regarding class certification; and second, whether the statutory amendment barring Department collection of consumer health care debt renders the claims for declaratory relief in the Medical Case moot.

### I. The Court of Appeals Did Not Err In Considering Sovereign Immunity In The Course Of The Class Certification Interlocutory Appeal.

The first preliminary matter we must address is the Medical Plaintiffs' argument that the Court of Appeals erred in considering sovereign immunity in the course of the interlocutory class certification appeal. More particularly, the

12

Medical Plaintiffs contend such an appeal is limited in scope to only class certification issues, and that the Court of Appeals therefore exceeded its jurisdiction in also addressing sovereign immunity. The Medical Plaintiffs further assert that the Court of Appeals also lacked jurisdiction because the defendants did not appeal the trial court's sovereign immunity ruling within the 30-day timeframe set forth in our Rules. We disagree.

### A. On Interlocutory Appeal, Appellate Courts May Narrowly Consider Threshold Questions Going To The Power Of The Lower Court To Adjudicate The Issue Being Appealed.

It is fundamental that a court must have jurisdiction before it may decide a case or issue. *See, e.g., Childers v. Albright*, 636 S.W.3d 523, 526 (Ky. 2021). This applies equally to trial and appellate courts alike. *Id.* Thus, jurisdiction is a threshold question and, where the question presents itself, a trial or appellate court must determine for itself whether it has jurisdiction to proceed. *Id.*

The general rule regarding appellate jurisdiction is that only the final orders of a trial court are appealable, and thus appellate courts lack jurisdiction to consider a trial court's interlocutory rulings. *Hensley v. Haynes Trucking, LLC*, 549 S.W.3d 430, 436 (Ky. 2018). However, there are some limited exceptions in which interlocutory rulings *are* appealable. As relevant to this case, CR 23.06 allows a party to appeal an "order granting or denying class action certification . . . within 10 days after the order is entered." Similarly, a trial court's interlocutory order denying a claim of sovereign immunity is also immediately appealable. *Breathitt Cnty. Bd. of Educ. v. Prater*, 292 S.W.3d 883,

13

887 (Ky. 2009) ("[A]n order denying a substantial claim of absolute immunity is immediately appealable even in the absence of a final judgment.").

Because interlocutory appeals deviate from the general rule that appellate courts have jurisdiction only to consider the final rulings of a trial court, we have noted that "interlocutory appeals are a vehicle to be used rarely, only to decide a few, enumerated issues." *Commonwealth, Cabinet for Health & Fam. Servs., Dep't for Medicaid Servs. v. Sexton ex rel. Appalachian Reg'l Healthcare, Inc.*, 566 S.W.3d 185, 190 (Ky. 2018). We have also noted that interlocutory appeals are subject to "strict parameters," requiring us to "focus our analysis" squarely on the limited issue being appealed. *Id.* We thus have frequently stated in addressing interlocutory appeals that we are limited to consideration of the issue giving rise to the interlocutory appeal "and nothing more." *Sexton*, 566 S.W.3d at 190 ("[T]he scope of appellate review of an interlocutory appeal of the trial court's determination of the application of sovereign immunity is limited to that issue and nothing more."); *see also, e.g., Henlsey*, 549 S.W.3d at 436 ("[T]he only question this Court may address today is whether the trial court properly certified the class to proceed as a class action lawsuit.").

While we therefore endeavor to narrowly confine our review of an interlocutory appeal to the issue being appealed, in some circumstances we may also be presented with a separate threshold question as to whether the lower court even had the "power to do what it did" with respect to that issue. *Hensley*, 549 S.W.3d at 438. We have held that in such circumstances, we

14

may undertake a limited review of that threshold question—though only so far as strictly necessary to determine whether the lower court indeed acted within its powers. *Id.*

For example, in *Hensley* we considered an interlocutory appeal from a class certification ruling. *Id.* at 434. The defendants objected that the trial court lacked subject matter jurisdiction because none of the claims met the minimum amount in controversy requirement. *Id.* at 437. We held that because a challenge to the class certification determination "is a proper issue for interlocutory appeal," so too is "challenging the trial court's initial subject-matter jurisdiction over a claim to make such a determination." *Id.* at 438-39. Thus, because subject matter jurisdiction over *at least one* claim was required for the trial court to have been empowered to make a class certification ruling *at all*, we could consider not only the merits of the trial court's class certification ruling, but also whether at least one claim satisfied the jurisdictional minimum amount in controversy requirement.[10] *Id.*

Similarly, in *Sexton* this Court considered whether it could address standing in the course of an interlocutory appeal regarding sovereign immunity. *Sexton*, 566 S.W.3d at 190. As with the subject matter jurisdiction at issue in *Hensley*, the Court noted that standing is "a predicate for a court to hear a case." *Id.* at 192. Thus, because the threshold question of standing

---

[10] However, we held that the determination of whether other claims also satisfied the minimum amount requirement was beyond the permissible scope of the interlocutory appeal, because a finding that even one claim met the requirement was all that was necessary to conclude the trial court had the power to hear the case and therefore certify it as a class action. *Id.*

went to the very power of the lower court to rule at all in the case, including with respect to sovereign immunity, the Court could consider standing in the course of the interlocutory sovereign immunity appeal:

> [A party raising standing concerns is] alleging that Kentucky courts cannot hear this case because no *justiciable cause—a constitutional predicate to maintaining a case in Kentucky courts*—exists. We hold that all Kentucky courts have the constitutional duty to ascertain the issue of constitutional standing, acting on their own motion, to ensure that only *justiciable causes* proceed in court, because the issue of constitutional standing is not waivable.

*Id.* at 191-92.

Here, as in *Hensley* and *Sexton*, the issue of whether the defendants are entitled to sovereign immunity is a threshold question that goes to the very power of the trial court to hear the case against them and certify it as a class action. Indeed, if the defendants enjoy such immunity, the trial court had no power to hear the claims against them, much less to certify those claims as a class action. *See Beshear v. Haydon Bridge Co, Inc.*, 416 S.W.3d 280, 286 (Ky. 2013) ("*Haydon Bridge II*") ("Sovereign immunity is an indisputable *limitation on the power of the judiciary*.") (quoting *Withers v. Univ. of Ky.*, 939 S.W.2d 340, 344 (Ky. 1997)) (emphasis added). As we have often noted, sovereign immunity "entitles its possessor to be free 'from the burdens of defending the action, not merely . . . from liability.'" *Prater*, 292 S.W.3d at 886 (quoting *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 474 (Ky. 2006)). Thus, because resolution of the defendants' claims of sovereign immunity was necessary to determine whether the trial court could even hear the case and certify a class action against those

16

defendants, the Court of Appeals did not err in considering sovereign immunity in the course of the interlocutory class certification appeal.

**B.     The Court of Appeals Could Consider Sovereign Immunity Arguments Despite The Lack Of A Notice Of Appeal From The Trial Court's Ruling Within The 30-Day Appeal Window.**

We also conclude that the defendants' failure to file an interlocutory appeal of the trial court's sovereign immunity ruling within the general 30-day appeal window did not deprive the Court of Appeals of jurisdiction. Certainly, as a general rule an appellate court may not consider an appeal in which a timely notice of appeal has not been filed. Our former CR 73.02(2) provided that the failure to file a timely notice of appeal would "result in a dismissal or denial," and our current RAP 2(A)(2) now explicitly also adds that "[t]he timely filing of a notice of appeal is jurisdictional." Moreover, our Rules of Appellate Procedure do not exempt interlocutory appeals from the temporal limitations set forth in RAP 3(A)(1) for the filing of a notice of appeal. Thus, as with an appeal from a final order, an interlocutory appeal generally must be timely filed before it may be considered by the appellate court. *See also Kennedy v. City of Cleveland*, 797 F.2d 297, 304 (6th Cir. 1986) ("[T]he appealability of orders denying absolute and qualified immunity is governed by the same temporal limitations and subject to the same rules as other appeals, whether interlocutory or final.").

Notably, however, because sovereign immunity may only be waived by the General Assembly, it may be raised for the first time on appeal—even where it does not form an asserted basis for the appeal. *See Wells v. Commonwealth,*

17

*Dep't of Highways*, 384 S.W.2d 308 (Ky. 1964) (finding sovereign immunity applicable against contract claim on appeal, even though such immunity was only first recognized in case law rendered after filing of the appeal, because sovereign immunity "is a constitutional protection that can be waived only by the General Assembly and applies regardless of any formal plea."). Similarly—and again in recognition of the fact that only the General Assembly may waive sovereign immunity—we conclude that a party's failure to file an appeal from an interlocutory denial of sovereign immunity within the 30-day timeframe under our Rules likewise does not operate as a waiver of that party's ability to seek interlocutory appellate review of sovereign immunity in a separate timely interlocutory appeal regarding another issue. Indeed, as a simple matter of logic, if a party may seek an appellate determination regarding sovereign immunity in a timely final appeal *even absent* a lower court ruling on that issue, it makes little sense to hold that it is forbidden from doing so in a timely interlocutory appeal regarding a separate issue simply *because* the lower court previously ruled on sovereign immunity and a timely notice of appeal from that ruling was not filed.

Thus, we hold that because sovereign immunity is waivable only by the General Assembly and because sovereign immunity may be raised even for the first time on appeal, a party's failure to file a notice of appeal within thirty days of a denial of sovereign immunity does not preclude interlocutory appellate consideration of that issue in a timely interlocutory appeal regarding a different issue. As such, because the Medical Case interlocutory class certification

18

appeal was timely filed, the Court of Appeals could also consider sovereign immunity during the course of that appeal.

**II.  The Medical Plaintiffs' Claims For Prospective Declaratory Relief Regarding The Collection Statutes Are Moot, But Their Claims For Retrospective Declaratory Relief Are Not Moot.**

We turn now to the second preliminary matter we must consider, namely whether the statutory amendment to KRS 131.130 barring Department collections of consumer health care debt renders the Medical Plaintiffs' claims for declaratory relief moot.  We first note that the Commonwealth does not have sovereign immunity against claims for purely declaratory relief.  *See Commonwealth v. Ky. Retirement Sys.*, 396 S.W.3d 833, 840 (Ky. 2013) ("[A] waiver of sovereign immunity is not necessary in a declaratory judgment action against the state."); *Univ. of Ky. v. Moore*, 599 S.W.3d 798, 813 (Ky. 2019) ("[T]he state is not sovereignly immune from a declaratory judgment action."). Thus, to the extent the Medical and Education Plaintiffs have stated claims for purely declaratory relief, the Court of Appeals correctly found that sovereign immunity does not bar those claims.

That said, the Medical Plaintiffs' requests for *prospective* declaratory relief regarding the Department's collection efforts are nonetheless moot and therefore must be dismissed.  A case or issue becomes moot "when a change in circumstance renders [the] court unable to grant meaningful relief to either party."  *Commonwealth, Ky. Bd. of Nursing v. Sullivan Univ. Sys., Inc.*, 433 S.W.3d 341, 344 (Ky. 2014).  Similarly, our declaratory judgment statute allows a plaintiff to seek declaratory relief only where "it is made to appear that *an*

19

*actual controversy* exists." KRS 418.040 (emphasis added). "An actual controversy for purposes of the declaratory judgment statute requires a controversy over *present rights, duties, and liabilities*." *Foley v. Commonwealth*, 306 S.W.3d 28, 31 (Ky. 2010) (quoting *Barrett v. Reynolds*, 817 S.W.2d 439, 441 (Ky. 1991)) (emphasis added). Thus, a "court will not decide speculative rights or duties which may or may not arise in the future, but only rights and duties about which there is a present actual controversy presented by adversary parties, and in which a binding judgment concluding the controversy may be entered." *Id.* (quoting *Veith v. City of Louisville*, 355 S.W.2d 295, 297 (Ky. 1962)).

Courts "lack subject matter jurisdiction to decide cases that have become moot." *Ky. Bd. of Nursing*, at 343. Because the courts lack subject matter jurisdiction to consider moot cases or claims, mootness is a threshold issue, and where it becomes apparent that a case or claim is moot, the court must dismiss it. *Id.* at 343-34.

Prior to 2022, the Collection Statutes did not include any specific prohibition against the Department's collection of consumer health care debts. In 2022, however, the General Assembly amended KRS 131.130 to specifically prohibit the Department from collecting "consumer debt owed for health care goods and services" on behalf of other state agencies. KRS 131.130(11). Thus, there is no longer any actual controversy as to whether, *prospectively*, the Department may lawfully utilize the Collection Statutes to collect consumer health care debt. KRS 131.130(11) makes clear that it may not. Thus, any

20

claims by the Medical Plaintiffs seeking a declaration that, *prospectively*, the Department may not rely upon the Collection Statutes in the collection of consumer health care debt are moot and must be dismissed. *See Bevin v. Beshear*, 526 S.W.3d 89, 91 (Ky. 2017) (finding case challenging governor's actions in reorganizing university board moot where intervening statutory amendment suspended governor's actions, displaced prior governing statutory scheme, and prospectively permitted governor to reorganize the board).

However, there nonetheless remains a live controversy as to whether the Department's *prior* use of the Collection Statutes to collect the Medical Plaintiffs' debt before the amendment to KRS 131.130 was unlawful. Before the 2022 amendment to KRS 131.130, there was no specific prohibition against Department collection of consumer health care debt. Notably, the Department therefore continues to maintain that its prior collections of such debt before the statutory amendment were permissible, while the Medical Plaintiffs dispute that contention. Thus, an actual controversy remains as to that issue, and the courts therefore retain subject matter jurisdiction to adjudicate the question. As such, to the extent the Medical Plaintiffs' seek a declaratory judgment that *retrospectively*, the Department's collections under the Collection Statutes before the amendment to KRS 131.130 were unlawful, those claims are not moot and may proceed.

III.    **The Scope Of The Defendants' Sovereign Immunity Against The Plaintiffs' Claims For Monetary Relief.**

Having addressed these threshold matters, we turn now to the central issue presented in this interlocutory appeal: Do the defendants have sovereign

21

immunity against the plaintiffs' claims for monetary relief in the form of a refund of funds collected from them by the Department?[11]

Sovereign immunity "is an inherent attribute of a sovereign state that precludes the maintaining of any suit against the state unless the state has given its consent or otherwise waived its immunity." *Yanero*, 65 S.W.3d at 517. It arises from common law and "prohibits claims 'against the government treasury absent the consent of the sovereign.'" *Haydon Bridge II*, 416 S.W.3d at 286 (quoting *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 799 (Ky. 2009)).

Though sovereign immunity arises from common law rather than any constitutional provision, Sections 230 and 231 of our present Constitution delegate to the General Assembly the authority to waive sovereign immunity either by an appropriation of funds or by specifying where and in what manner suit may be brought against the Commonwealth. *Id.* at 287. Section 230

---

[11] Technically, only the Commonwealth itself has sovereign immunity, while state agencies and their employees sued in a representative capacity, such as the defendants here, have governmental immunity. *Furtula v. Univ. of Ky.*, 438 S.W.3d 303, 305 n.1 (Ky. 2014) ('Since the University of Kentucky is a state agency, and not the state itself, they can only have governmental immunity, which while related to and flowing from sovereign immunity, is nevertheless a slightly different concept."); *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) ("[W]hen an officer or employee of a governmental agency is sued is his/her representative capacity, the officer's or employee's actions are afforded the same immunity, if any, to which the agency, itself, would be entitled . . . ."). However where, as here, there is no dispute that the defendants performed governmental rather than proprietary functions, the distinction is one without a difference. *Furtula*, 438 S.W.3d at 305 n.1. ("[T]o the extent that the agency is performing a governmental function, as a state university does, its governmental immunity is functionally the same as sovereign immunity."). Thus, because the trial court, the Court of Appeals, and the parties in their briefing to this Court have consistently used the term "sovereign immunity," we will use the same term here.

provides in relevant part that "[n]o money shall be drawn from the State Treasury, except in pursuance of appropriations made by law," while Section 231 states that "[t]he General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth."

Sovereign immunity is implicated here because the plaintiffs seek a refund of funds collected from them by the Department pursuant to the Collection Statutes and placed in the State Treasury. *See Hadyon Bridge II*, 416 S.W.3d at 291 ("Sovereign immunity protects public coffers or, as it is sometimes denominated, the public purse."). Broadly speaking, KRS 45.237 and 45.238 allow state agencies to refer certain debts to the Department for collection. KRS 45.241 also allows state agencies to refer a "liquidated debt"— defined as "a legal debt for a sum certain which has been certified by an agency as final due and owing, all appeals and legal actions having been exhausted"— to the Department for collection. KRS 45.241(1)(b)(1), (8). In *Moore*, we considered the Collection Statutes, and more particularly whether 1) UK is within the Executive Branch such that the Collection Statutes are available for collection of its debts, and 2) whether sovereign immunity barred the purely declaratory relief sought by the plaintiffs there. *Moore*, 599 S.W.3d at 803. We held that UK was within the Executive Branch, and that sovereign immunity did not bar the plaintiffs' requested declaratory relief. *Id.* at 813.

Notably, the plaintiffs in *Moore* sought *only* declaratory relief. *Id.* at 811 n.24 ("Moore only seeks a declaration of rights."). As such, we were not asked to consider whether sovereign immunity barred any form of monetary relief.

23

The plaintiffs here *do* seek monetary relief in the form of a refund from the State Treasury of funds taken from them by the Department, and we therefore must now consider whether sovereign immunity bars such claims.

The crux of the Plaintiffs' argument is that sovereign immunity does *not* bar a refund of the funds taken by the Department under the Collection Statutes because those funds were wrongfully collected and thus never vested in the State Treasury. We agree, partly. We conclude that sovereign immunity does not bar a monetary claim for a refund of funds from the State Treasury that were *never* due to the state. However, sovereign immunity does bar a claim for a refund of funds that were due to the state—even if those funds were unlawfully or improperly collected.

Indeed, our case law makes this distinction clear. In *Ross v. Gross*, 300 Ky. 337, 188 S.W.2d 475 (1945), various state agencies and officials withheld 25% of the fees received by certain Harlan County officers. *Id.* at 476. This was permissible if the county had a population of at least 75,000. *Id.*; Ky. Const. § 106. However, upon suit by the county officers, the trial court determined that Harlan County did not have a population of at least 75,000 and thus ordered the state agencies and officials to return the withheld fees to the county officers. *Ross*, 188 S.W.2d at 476.

On appeal, the sole question to be determined was "whether [the funds] can be paid out of the General Fund in the absence of legislative appropriation." *Id.* at 477. Our predecessor Court specifically quoted Section 230's provision that "[n]o money shall be drawn from the State Treasury,

24

except in pursuance of appropriations made by law," yet nonetheless concluded that Section 230 did not bar a judgment awarding a refund of the fees because those fees had never been due to the state:

> It seems to us that since the money belonged to the [county officers] or the County, its payment into the State Treasury did not vest the State with title thereto or a right to its custody; that the purpose of [Section 230] . . . was to prevent the expenditure of the State's money without the consent of the Legislature; and that **it could not have been the intention of the framers of the Constitution to require the true owner of money so placed in the State Treasury to await the pleasure of the Legislature in order to recover that which had been adjudged by a Court of competent jurisdiction to have been at all times his own**.

*Id.* (emphasis added). In other words, the Court found that the Kentucky Constitution does not prohibit a judicial order directing a refund from the State Treasury of funds that were never due to the state. Thus, while the Court in *Ross* may not have explicitly used the term "sovereign immunity," its holding makes clear that sovereign immunity does not bar such a claim.

In contrast to the request at issue in *Ross* for a refund of funds *not* due to the state, we held in *Haydon Bridge II* that the Commonwealth does have sovereign immunity against a claim for judicial relief affecting funds in the State Treasury that *were* due to the state. In *Haydon Bridge II*, employers who paid workers' compensation insurance premiums obtained an injunction requiring that funds transferred from the Benefit Reserve Fund to the General Fund be returned to the Benefit Reserve Fund. 416 S.W.3d at 284. The funds consisted at least in part of assessments against the employers' premium

25

payments. *Id.* The Governor appealed and asserted the injunction violated sovereign immunity. *Id.* at 287. We agreed. *Id.* at 295.

First, we found *Ross* distinguishable, noting that its "refund concept is one applicable when a person pays monies into the State Treasury that are not owed to the state" and thus *Ross* "applies to funds that are not due to the State Treasury."[12] *Id.* at 290. We then proceeded to consider the separate question presented in *Haydon Bridge II*, namely whether the Commonwealth has sovereign immunity against a claim affecting funds in the State Treasury that *were* due to the state. *Id.* at 289 ("In this case, Plaintiffs' workers compensation insurance premiums were lawfully subject to assessment . . . and those assessments were literally 'due to the state.'"). We found that the Commonwealth enjoys sovereign immunity against such claims, and that the injunction violated that immunity:

> [T]he retroactive injunctive relief ordered here . . . impinge[s] on sovereign immunity because [it] require[s] monetary relief that can only be satisfied by draws on [the] state's treasury. . . . [S]overeign immunity bars the retroactive monetary relief ordered by the trial court regardless of whether it is labeled a retroactive injunction, equitable restitution, or some other type of remedy.

---

[12] We also stated in *Haydon Bridge II* that "the concept of sovereign immunity does not appear to have been raised in *Ross*" and that "*Ross* . . . never addressed sovereign immunity." *Id.* at 290-91. It is true that the phrase "sovereign immunity" does not appear in *Ross*. However, the *Ross* Court explicitly quoted, relied upon, and construed Section 230's prohibition against payments from the State Treasury absent legislative appropriation, and found it did not bar a refund of funds paid but never due to the state. *Ross*, 188 S.W.2d at 477. *Ross* thus at least implicitly, if not explicitly, relates to the Commonwealth's sovereign immunity against such claims.

26

*Haydon Bridge II*, 416 S.W.3d at 291-95. Finally, we also noted the grave separation of powers concerns that would be raised by a judicial order affecting funds in the State Treasury that were due to the state:

> To order monetary relief in this case would create a perfect storm, an unprecedented collision of the constitutional powers accorded the three separate branches of government. The judiciary would be ordering the executive branch . . . to remove more than $32 million from the [BRF]. Notably, *some portion of that $32 million transferred from the BRF was general state revenues that came from the General Fund to begin with . . . .* Under our tripartite form of government, the courts have never had the power to draw on the State Treasury without the legislature's consent *in circumstances such as those before us.*

*Id.* at 296-97 (emphasis added).

As such, *Haydon Bridge II* draws a clear line between, on the one hand, judicial relief directing a refund from the State Treasury of funds that were never due to the state and, on the other hand, judicial relief affecting State Treasury funds that were in fact due to the state. Though defendants contend *Haydon Bridge II* holds that *any* judicial order requiring a draw on the State Treasury will violate sovereign immunity and raise grave separation of powers concerns, *Haydon Bridge II* does not stand for such an across-the-board proposition. Rather, when understood within its context, *Haydon Bridge II* simply holds that a judicial order requiring a draw from the State Treasury of funds *due to the state* will violate sovereign immunity and raise separation of powers issues. *Haydon Bridge II* in no way overruled *Ross*'s holding that a judicial order directing the refund from the State Treasury of funds never due to the state does *not* violate Section 230. Nor did it overrule the *Ross* Court's

27

conclusion that the framers of our Constitution never intended "to require the true owner of money [not vested in the state] in the State Treasury to await the pleasure of the Legislature in order to recover that which had been adjudged by a Court of competent jurisdiction to have been at all times his own." *Ross*, 188 S.W.2d at 477.

Thus, in construing and harmonizing *Ross* and *Haydon Bridge II*, we hold today that while sovereign immunity bars a claim for judicial relief affecting funds in the State Treasury that *were* due to the state, sovereign immunity does *not* bar a monetary claim for a refund from the State Treasury of funds that were *never* due to the state. Indeed, no democracy that jealously guards the rule of law, that steadfastly endeavors to maintain a proper balance between the rights of state and citizen, and that robustly protects private property rights could countenance a sovereign immunity so powerful as to permit the state to take and keep that which it was never entitled to hold. *See Great Atlantic & Pacific Tea Co. v. City of Lexington*, 256 Ky. 595, 76 S.W.2d 894, 895 (1934) ("Money paid without consideration and which in law, honor, or good conscience was not payable ought in law, honor, and good conscience to be recoverable, and that rule applicable to transactions between individuals should be generally made applicable to municipalities and other governments.").

Conversely—and as noted above—it is also true that sovereign immunity protects the state from judicial relief affecting funds in the State Treasury that are "the State's money." *Ross*, 188 S.W.2d at 340 ("[T]he purpose of [Section

28

230] was to prevent the expenditure of *the State's money* without the consent of the Legislature.") (emphasis added). In recognition of that immunity, as well as *Ross*'s own limitation to claims against the State Treasury involving funds that never vested in the state, we further hold that sovereign immunity does bar a claim for a return of funds that were due to the state—even if the state improperly or unlawfully collected those funds. In such circumstances, though the collection was improper or illegal, the fact remains that the collected funds were due to the state. Thus, upon collection, those funds become "the State's money" and any claim seeking judicial relief directing a return of the funds to the debtor is beyond the purview of the courts.[13]

Of course, at this interlocutory juncture, there has been no final determination as to whether the funds collected by the Department were or were not due to the state. It may be that some funds collected from a plaintiff were due to the state, and some were not. For example, it may ultimately be determined that a particular plaintiff in fact owed the debt claimed by a state agency, but that the Department unlawfully used the Collection Statutes to collect that debt. On such a finding, the debt collected may constitute funds due to the state that the courts cannot order returned, but the assessment of interest and fees under the Collection Statutes may constitute funds the state was never entitled to receive and that the courts may therefore order

---

[13] We are not presented with, and thus need not consider, the propriety of any judicial relief to remedy consequential damages purportedly flowing from the Department's allegedly unlawful use of the Collection Statutes and related collection practices, such as damages caused by an imposition of liens or garnishment of wages and accounts.

29

refunded.[14]  Or it may be that a particular plaintiff never owed the underlying claimed debt at all, and thus might be entitled to a refund of all the funds taken by the Department.  In any event, given our holding regarding the scope of the defendants' sovereign immunity as outlined above, the case should be remanded to the Circuit Court for a determination as to which funds were and were not due to the state, dismissal of those claims for a refund of funds due to the state, and adjudication of claims for a refund of funds never due to the state.[15]

### IV. There Is No Statutory Waiver Of The Commonwealth's Sovereign Immunity Against Monetary Claims For Refund Of Funds Due To The State.

Given our holding that sovereign immunity bars any claims by the plaintiffs for a refund from the State Treasury of funds that were due to the state, we must now also consider the plaintiffs' contention that any such

---

[14] We acknowledge UK's contention that certain amounts may be deemed due to the state because the debtor failed to pursue administrative remedies.  However, as that merits issue is beyond the scope of matters properly before this Court on interlocutory appeal, we express no opinion on the validity of that position.  That, along with other issues relevant to a determination of what was due to the state, must be made by the trial court in the first instance on remand.

[15] We disagree with the Department's contention that plaintiffs' claims fall within the exclusive jurisdiction of the Board of Claims.  The Department points out that plaintiffs seek "damages" and that KRS 49.060 directs that "[t]he Board of Claims shall have exclusive jurisdiction to hear claims for damages, except as otherwise specifically set forth by statute, against the Commonwealth."  However, as expressly stated in KRS 49.060, that statute's purpose is to "provide the means to enable a person *negligently* injured by the Commonwealth . . . to be able to assert their just claims as herein provided."  (Emphasis added).  As such, the statute vests exclusive jurisdiction of *negligence* claims against the Commonwealth in the Board of Claims.  Thus, because plaintiffs' claims here do not sound in negligence, their claims do not fall within the exclusive jurisdiction of the Board of Claims.  *See Letcher Cnty. Bd. of Ed. v. Hall*, 671 S.W.3d 374, 381 (Ky. 2023) (concluding that claim not requiring a showing of negligence "does not fall within the exclusive jurisdiction of the Board of Claims.").

30

immunity has been waived. As noted above, while the Commonwealth enjoys sovereign immunity, that immunity may be waived by—and only by—the General Assembly. *Wells*, 384 S.W.2d at 308 ("The defense of sovereign immunity . . . can be waived only by the General Assembly . . . ."). We will find a waiver of sovereign immunity "only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Ky. Retirement Sys.*, 396 S.W.3d at 836 (quoting *Withers*, 939 S.W.2d at 346).

Plaintiffs point to three statutes as purportedly waiving the Commonwealth's sovereign immunity. We do not find that any of them constitute such a waiver. First, plaintiffs contend KRS 45.111 waives sovereign immunity. That statute provides that "[a]ny refunds received into the State Treasury which are later determined not to be due to the state may be refunded to the person who paid such funds into the Treasury." However, by its plain terms, the statute applies only to funds found "not to be due to the state." Thus, it does not waive the Commonwealth's sovereign immunity that we have found applicable here today, namely that against a claim for a refund of funds due to the state.

Second, plaintiffs assert that KRS 131.565 waives the Commonwealth's sovereign immunity. More particularly, they point to that statute's provision that "[e]ach state agency requesting the withholding of any individual income tax refund shall indemnify the [Department] against any and all damages, court costs, attorneys fees, and any other expenses related to litigation . . . as it

31

pertains to a refund withhold action requested by such agency." However, we have previously held that statutorily directed insurance or indemnity alone does not constitute an implicit waiver of sovereign immunity. *Withers*, 939 S.W.2d at 346 ("If immunity exists, it is not lost or diminished or affected in any manner by the purchase of liability insurance or the establishment of an indemnity fund . . . directed or authorized by statute."). Likewise, the mere fact that KRS 131.565 requires state agencies to indemnify the Department in connection with certain tax refund withholding litigation does not rise to the level of an "overwhelming implication" that the General Assembly has waived sovereign immunity as required for us to find waiver. *Ky. Retirement Sys.*, 396 S.W.3d at 836.

Finally, plaintiffs also contend that KRS 131.570 constitutes a waiver of sovereign immunity. That statute requires state agencies to "promptly refund" to a taxpayer funds received from the Department in excess of the debt owed to the agency. KRS 131.570(3). The statute also provides that if the Department erroneously transfers funds to a state agency, the agency is to reimburse the Department and the Department must "refund to the taxpayer the appropriate amount of such returned funds." KRS 131.570(4). Again, as with KRS 45.111, this statute relates to the treatment of funds received but never due to the state. And under *Ross*, the Commonwealth in any event has no sovereign immunity against judicial relief regarding such funds. However, the statute does not speak to, and therefore certainly does not waive, the sovereign immunity we have found applicable today, *i.e.* against a claim for a refund of

32

funds due to the state.  Accordingly, because we find no waiver of the Commonwealth's sovereign immunity as to funds that were due to the state, plaintiffs' claims for a return of any such funds must be dismissed.[16]

## V.      The Defendants Do Not Have Sovereign Immunity Against Any Viable Takings Claim.

The plaintiffs also assert the defendants do not have sovereign immunity against a constitutional takings claim.  We agree.

Sections 13 and 242 of our Constitution require the government to provide just compensation for property it takes.  Section 13 provides that a person's property shall not "be taken or applied to public use . . . without just compensation being previously made to him."  Similarly, Section 242 requires that municipalities, corporations, and persons "invested with the privilege of taking private property for public use, shall make just compensation for property taken, injured or destroyed by them."

As our predecessor Court observed, these provisions constitute a waiver of sovereign immunity as to constitutional takings claims.  *Lehman v. Williams*, 301 Ky. 729, 193 S.W.2d 161, 731 (1946) ("[W]here private property is taken for public use, or where there is a trespass thereon which amounts to such

---

[16] Because our decision today makes clear that plaintiffs, upon a proper showing and findings by the trial court, may recover funds never due to the state but not funds due to the state (even if unlawfully or improperly collected), we need not address the contention that the issue of whether plaintiffs may recover monetary relief flowing from a declaratory judgment is unripe.  Sovereign immunity does not bar such relief to remedy a payment of funds never due to the state, but does bar such relief in the form of a refund of funds due to the state.  We are not presently presented with any other forms of request for monetary relief and therefore do not consider the propriety of any such requests at this time.

taking, the state's immunity from suit is waived through [sections 13 and 242] of the Constitution . . . .") (quoting *Ky. Bell Corp. v. Commonwealth*, 295 Ky. 21, 172 S.W.2d 661, 663 (1943)); *Stathers v. Garrard Cnty. Bd. of Educ.*, 405 S.W.3d 473, 484 (Ky. App. 2012) ("[S]ections 13 and 242 of the Kentucky Constitution represent a waiver of governmental sovereign immunity."). Indeed, these provisions would be wholly meaningless if a party could not bring suit to obtain just compensation for a taking of its property by the government. As such, to the extent plaintiffs may have stated viable constitutional takings claims, the defendants do not have sovereign immunity against those claims.

## CONCLUSION

We hold that sovereign immunity does not bar plaintiffs' claims for purely declaratory relief, their claims for a refund from the State Treasury of funds never due to the state, or their constitutional takings claims. We further hold that the defendants are entitled to sovereign immunity as to any claims by plaintiffs for payment of funds from the State Treasury that were due to the state, even if those funds were unlawfully or improperly collected.

We thus affirm the Court of Appeals in part, reverse in part, and remand. We affirm in full the Court of Appeals' decision to address sovereign immunity in the interlocutory class action appeal, and its holding that sovereign immunity does not bar purely declaratory relief against the defendants. We conclude nonetheless that the statutory amendment to KRS 131.130 renders any claims for *prospective* declaratory relief in the Medical Case moot.

34

However, claims for retrospective declaratory relief in that case remain justiciable.

We affirm in part the Court of Appeals' holding that sovereign immunity bars the plaintiffs' requests for monetary relief. We agree that sovereign immunity bars any claim for payment from the State Treasury of funds that were due to the state, even if unlawfully or improperly collected. However, we reverse the Court of Appeals to the extent its holding would apply sovereign immunity to claims for a refund of funds that were never due to the state.

We therefore remand this matter to the Franklin Circuit Court. Upon remand, the Circuit Court shall 1) dismiss claims for prospective declaratory relief in the Medical Case as moot, 2) dismiss claims for monetary relief in the form of a return of funds that were due to the state (even if unlawfully or improperly collected) as barred by sovereign immunity, and 3) conduct further proceedings as appropriate regarding the remaining claims for purely declaratory relief, claims for monetary relief in the form of a refund of funds that were never due to the state (including, if appropriate, fees, interest, or other monies collected pursuant to inapplicable statutes), and constitutional takings claims.

Lambert, C.J.; Bisig, Conley, Keller, Nickell, and Thompson, JJ., sitting. Lambert, C.J.; Keller and Nickell, JJ., concur. Conley and Thompson, JJ., each concur in part and dissent in part by separate opinion. Goodwine, J., not sitting.

35

THOMPSON, J., CONCURRING IN PART AND DISSENTING IN PART:

Respectfully, I disagree with the majority's reasoning and outcome in large part. I concur in so far as I agree with the majority opinion that the plaintiffs also were entitled to seek declaratory relief except as to any claims for prospective declaratory relief in the medical case as the amendment to Kentucky Revised Statutes (KRS) 131.130 makes such claim moot. I also agree that the defendants cannot keep money that was not due them, but I disagree that any money was due them at the time it was collected because such debt was not yet liquidated.

I write separately to express my disagreement with: (1) the majority opinion's holding that a governmental party can obtain appellate review of an order denying it sovereign immunity long after the period to file a timely notice of appeal has lapsed pursuant to the Kentucky Rules of Appellate Procedure (RAP); and (2) the majority opinion's upholding of unfair debt collection practices that are not in line with statutory authority.

**I. UNTIMELY APPEAL BY THE MEDICAL DEFENDANTS**

I disagree that we can simply ignore that the sovereign immunity issue is improperly before us by the medical defendants[17] when it is raised in clear violation of the RAP. This allows these government defendants to flout the

---

[17] The medical defendants are comprised of the University of Kentucky defendants and the Kentucky Department of Revenue. Each group has separate representation and, so, submitted different pleadings. The educational defendants (despite having some defendants in common with the medical defendants) are properly before this Court as they timely appealed from the order which denied their immunity defenses.

36

thirty-day appellate deadline contained in RAP 3(A)(1) and be absolved from any consequences. I conclude that our precedent regarding when an immunity defense can be properly raised for consideration does not control the resolution of when an adverse ruling denying such defense may be appealed.

I would hold that defendants must timely file a notice of appeal from any denial of immunity to be entitled to an interlocutory appeal of such denial. Defendants affirmatively choosing not to file a timely notice of appeal from such a denial is an affirmative waiver of their right to an interlocutory appeal.

However, as there is a lack of any precedent making such distinction clear, and the plaintiffs' motion for discretionary review in 2024-SC-0229-DGE urged the granting of such review as "needed to clarify the jurisdictional limitations of interlocutory appeals[,]" it is appropriate for us to address the issue to provide clarification and guidance. Accordingly, I conclude that considering the specific facts of this case, the error in allowing the appeal to proceed is ultimately harmless.

### A. An Appeal of an Order Denying Immunity Cannot Properly be Raised in an Untimely Interlocutory Appeal.

Our precedent states that sovereign immunity can be raised as a defense at any time, even *sua sponte* by our Courts, as held in *Wells v. Commonwealth, Dep't of Highways*, 384 S.W.2d 308, 308 (Ky. 1964), which is repeatedly cited as authority for such a proposition.[18] An interlocutory appeal can properly be

---

[18] *See also Dep't of Corr. v. Furr*, 23 S.W.3d 615, 616 (Ky. 2000); *Dep't of Highways v. Davidson*, 383 S.W.2d 346, 348 (Ky. 1964); *Metro Louisville /Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 14 (Ky. App. 2009).

taken from the denial of sovereign immunity as explained in *Breathitt Cnty. Bd. of Educ. v. Prater*, 292 S.W.3d 883, 887 (Ky. 2009).

This precedent, which establishes the right to raise an immunity defense even during an appeal simply does not control the resolution of whether we must allow untimely interlocutory appeals from orders denying such defenses. In *Wells* and *Prater* there is no dispute that each case was properly before our appellate courts for review pursuant to a timely notice of appeal and the courts did not consider whether it was appropriate to accept an untimely interlocutory appeal from a denial of immunity.[19]

Our rules are clear; there are strict limitations on when appeals may be filed, and those rules are generally the same for interlocutory appeals and direct appeals. By statute, "[t]he Court of Appeals has jurisdiction to review interlocutory orders of the Circuit Court in civil cases, *but **only** as authorized by rules promulgated by the Supreme Court.*" KRS 22A.020(2) (emphasis added).

It is well established that "an immunity defense is an appealable issue by interlocutory appeal." *Baker v. Fields*, 543 S.W.3d 575, 577 (Ky. 2018). RAP 3(A)(1) requires a notice of appeal to be filed "no later than 30 days" after the order being appealed is finalized. RAP 2(A)(2) specifically states "timely filing of

---

[19] In *Wells*, 384 S.W.2d at 308, the judgment was before our then highest Court on direct appeal. *Prater* came before our Courts as follows: *Breathitt Cnty. Bd. of Educ. v. Prater*, 2007-CA-000141-MR, 2007 WL 3227220, at *1 (Ky. App. Nov. 2, 2007) (unpublished) (judgment before the Court of Appeals on direct appeal); *Prater*, 292 S.W.3d at 885–86 (judgment before our Court on discretionary review). *See also Furr*, 23 S.W.3d at 616 (judgment before the Court of Appeals on direct appeal and then before our Court on discretionary review); *Davidson*, 383 S.W.2d at 347 (judgment before the Court of Appeals on direct appeal); *Abma*, 326 S.W.3d at 4 (judgment before the Court of Appeals on direct appeal).

a notice of appeal is jurisdictional." As explained in RAP 10(A), "[t]he failure of a party to timely file a notice of appeal . . . *shall* result in a dismissal or denial." (Emphasis added). This language is a repetition of Kentucky Rules of Civil Procedure (CR) 73.02(2), which it replaced.

Our Rules of Appellate Procedure do not exempt interlocutory appeals from the limitations set forth in RAP 3(A)(1) for the filing of a notice of appeal. Thus, as with an appeal from a final order, an interlocutory appeal must be timely filed before it may be considered by the appellate court. *Kennedy v. City of Cleveland*, 797 F.2d 297, 304 (6th Cir. 1986), states "the appealability of orders denying absolute and qualified immunity is governed by the same temporal limitations and subject to the same rules as other appeals, whether interlocutory or final."

In contrast, there are specific rules which both authorize interlocutory appeals in certain situations and provide explicit deadlines and procedures for filing such notices of appeal, namely RAP 20(B) which provides that certain temporary injunction rulings may be appealed within twenty days and CR 23.06 which specifies that the grant or denial of class certification must be appealed within ten days. These rules each apply to a narrow, discrete issue subject to quick resolution. Indeed, CR 23.06 provides that the review of a ruling on class certification requires expedited review. These rules do not explicitly or implicitly allow for any other interlocutory rulings to be combined in such appeals.

It is undisputed that the medical defendants (unlike the educational defendants) failed to timely file their notices of appeal from the order granting partial judgment on the pleadings, which determined the medical defendants were not entitled to immunity as a defense to any of the plaintiffs' claims.[20] It is also undisputed that the medical defendants timely filed their notices of appeal from the order granting class certification.[21]

What is disputed is whether the medical defendants can use the mechanism of a timely interlocutory appeal from the order granting class certification to also file an untimely interlocutory appeal from the orders denying immunity almost six months after it was due. I conclude that the answer is "no" and that the medical defendants' opportunity for an interlocutory appeal from an order denying immunity is subject to the limitations provided by our rules. I reach that conclusion by considering: the purpose behind our decision to allow interlocutory appeals of orders denying immunity and the narrow scope of interlocutory appeals generally.

**B. The Purpose Behind Allowing Interlocutory Appeals of Orders Denying Immunity Can Only be Fulfilled Through the Filing of an Interlocutory Appeal withing the RAP.**

As established in *Prater*, 292 S.W.3d at 887, "an order denying a substantial claim of absolute immunity is immediately appealable even in the

---

[20] On August 15, 2022, the order granting partial judgment on the pleadings was entered. On September 19, 2022, the motions for reconsideration were denied. Therefore, the medical defendants' notices of appeal were due by Tuesday, October 18, 2022.

[21] The order granting class certification was entered on March 28, 2023.

absence of a final judgment."[22] The Court reasoned that immunity is a substantial right which "entitles its possessor to be free 'from the burdens of defending the action, not merely . . . from liability.'" *Id.* at 886 (quoting *Rowan Cnty. v. Sloas,* 201 S.W.3d 469, 474 (Ky. 2006)). *See Lexington-Fayette Urban Cnty. Gov't v. Smolcic,* 142 S.W.3d 128, 135 (Ky. 2004). Such a right would be rendered moot if an immune party is forced to proceed with litigation. *Prater,* 292 S.W.3d at 886.

Sovereign immunity is a threshold issue that can and should be ruled on early in the litigation by circuit courts, and then be appealed within the RAP. In *Hunter v. Bryant,* 502 U.S. 224, 227-28 (1991) (per curium), the United States Supreme Court noted that it has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." The entire justification for an interlocutory appeal is to prevent a party entitled to immunity from the cost and expense of defending such an action. Therefore, "orders denying claims of immunity . . . should be subject to prompt appellate review." *Prater,* 292 S.W.3d at 886. Prompt review means just that; a notice of appeal from such an order should be filed timely.

---

[22] Absolute immunity applies to sovereign immunity and governmental immunity. Our Court subsequently concluded that orders denying qualified official immunity and legislative immunity are also immediately appealable. *Meinhart v. Louisville Metro Gov't,* 627 S.W.3d 824, 830 (Ky. 2021); *Stivers v. Beshear,* 659 S.W.3d 313, 317 (Ky. 2022). However, "[i]f the trial court's decision leaves the immunity question unresolved, that order is not immediately appealable." *Upper Pond Creek Volunteer Fire Dep't, Inc. v. Kinser,* 617 S.W.3d 328, 333 (Ky. 2020).

41

Delaying resolution of a party's entitlement to immunity, after such defense was rejected in a trial court's order,[23] until another appeal may be filed is counterproductive to the purpose behind allowing such an interlocutory appeal: that immune parties should not have to expend time and expense defending a claim for which they are immune.

### C. Interlocutory Appeals are Narrow in Scope.

Interlocutory appeals are subject to "strict parameters" which limit appellate review to only the subject matter which justified the filing of the notice of appeal. *Hensley v. Haynes Trucking, LLC*, 549 S.W.3d 430, 436 (Ky. 2018). Thus, a notice of appeal from whether immunity was properly denied, class certification was properly granted or denied, or arbitration was required, cannot justify the interlocutory review of a different issue.

As explained in *Baker*, 543 S.W.3d at 578:

> A court can only address the issues presented in the interlocutory appeal itself, nothing more. Otherwise, interlocutory appeals would be used as vehicles for bypassing the structured appellate process. Specifically, this means, and we hold, that an appellate court reviewing an interlocutory appeal of a trial court's determination of a defendant's immunity from suit is limited to the specific issue of whether immunity was properly denied, nothing more.

*See, e.g., Ky. Heritage Land Conservation Fund Bd. v. Louisville Gas & Elec. Co.*, 648 S.W.3d 76, 82 (Ky. App. 2022).

An interlocutory appeal concerning "whether the trial court properly certified the class to proceed as a class action lawsuit[,]" constitutes "the only

---

[23] Typically, this would be in an order denying a motion to dismiss or for summary judgment based on immunity.

question [a reviewing] Court may address" on interlocutory appeal. *Hensley*, 549 S.W.3d at 436. An interlocutory appeal regarding class certification is not an open door to review other issues. *Id. at* 438–39.

Similarly, in an interlocutory appeal regarding the right to take, "the right to take is the sole issue." *Kuchle Realty Co., LLC v. Commonwealth*, 571 S.W.3d 95, 103 (Ky. App. 2018). Likewise, an interlocutory appeal on arbitration is limited to that singular issue and the reviewing Court is "precluded from addressing any of the other issues ruled on by the circuit court[.]" *WellCare Health Ins. Co. of Ky., Inc. v. Trigg Cnty. Hosp., Inc.*, 532 S.W.3d 163, 168 (Ky. App. 2017).

I see no justification for carving out a special exception for extending the reach of a particular interlocutory appeal to cover another issue which should have been, but was not, timely appealed.[24] It is notable to me that the ostensible purpose of the original interlocutory appeal, resolving whether class certification was appropriately granted, was not even placed before us as an issue that required resolution in the medical defendants' motions for discretionary review. Instead, the only issue before us is the sovereign/governmental immunity issue.

Our sister Courts, who have specifically considered whether an untimely interlocutory appeal of immunity may be combined with a timely interlocutory

---

[24] If defendants wish to have multiple interlocutory issues considered together, they may ask trial courts to rule on these issues simultaneously, or after filing the first notice of appeal ask that a ruling be delayed until another issue is resolved and appealed so these appeals may be consolidated.

appeal of another issue, have flatly rejected allowing such an action to proceed. In *Tierra Realty Tr., LLC v. Vill. of Ruidoso*, 296 P.3d 500, 511 (N.M. 2013), a case that is procedurally identical to the one before us, the New Mexico Supreme Court ruled that where the issue of sovereign immunity was presented in a motion to dismiss and denied by the trial court, and the party failed to seek interlocutory review of that issue, it could not be later raised through the vehicle of an appeal of class certification. The Court explained:

> Our grant of review in this case is strictly confined by our Appellate Rules to the consideration of the district court's class certification . . . . Because Defendant did not seek interlocutory review of the motion to dismiss, we decline to address the issue within the narrow context of our review of class certification decisions pursuant to Rule 1-023(f)[.25]

Similarly, in *City of Fort Lauderdale v. Hinton*, 276 So.3d 319, 326 (Fla. App. 2019), a case in which an interlocutory appeal was allowed regarding whether there was sufficient expert testimony to support a medical negligence claim proceeding to trial, the Court stated that even if the issue of subject matter jurisdiction "was reviewable at any time as the City argues, then there would be no need to include it in the nonfinal appeal rule providing a limited time to appeal. *See* Fla. R. App. P. 9.130(b)."[26]

---

[25] New Mexico's Rule 1-023 pertains to class actions and section F states: "Appeals. The Court of Appeals may in its discretion permit an appeal from an order of a district court granting or denying class certification under this rule if application is made to it within fifteen (15) days after entry of the order."

[26] Florida Rules of Appellate Procedure (FRAP) 9.130 involves the review of nonfinal orders. It authorizes the appeal of nonfinal orders which "deny a motion that . . . asserts entitlement to sovereign immunity[.]" FRAP 9.130 (a)(3)(F)(iii). The section of the FRAP cited in *Hinton* states: "Commencement. Jurisdiction of the court under subdivisions (a)(3)-(a)(5) of this rule shall be invoked by filing a notice with the clerk of

These cases illustrate that an appeal cannot be taken from a denial of immunity at any time simply by combining it with the timely interlocutory appeal of a separate issue. There is one chance for an interlocutory appeal of a rejected immunity defense, not unlimited chances. Just because an interlocutory appeal is properly before appellate courts on another issue, does not mean that the scope of such a limited appeal can or should be stretched beyond its proper purposes to encompass the denial of immunity. It goes against our prior case law to address issues that are not properly contained in the timely interlocutory appeal. Instead, parties must properly appeal from such denials in accordance with the rules that permit such appeals, that is within thirty days of such a denial.

"The common definition of a legal waiver is that it is a voluntary and intentional surrender or relinquishment of a known right, or an election to forego an advantage which the party at his option might have demanded or insisted upon." *Greathouse v. Shreve*, 891 S.W.2d 387, 390 (Ky. 1995) (quoting *Barker v. Stearns Coal & Lumber Co.,* 291 Ky. 184, 163 S.W.2d 466, 470 (1942)). The medical defendants each had a substantive legal "right" to assert their immunity defense and to challenge its denial through an interlocutory appeal, subject to filing a timely notice of appeal in accordance with our rules. Here, the medical defendants made the unilateral decision to "forego" that right by voluntarily choosing not to file a timely notice of appeal.

---

the lower tribunal within 30 days of rendition of the order to be reviewed." FRAP 9.130(b).

45

The "right" to interlocutory appellate relief granted by our Court to defendants who claim immunity is not found in our Constitution, statutes, or even our procedural rules. It is an opportunity, a matter of judicial grace—one that can either be accepted, rejected, or waived by a litigant. I do not agree with the idea that a waiver of judicially sanctioned *appellate* right for an early review to benefit governmental defendants (should they choose to exercise such a right) needs to be subservient to a declaration of the General Assembly. Decisions made by parties, or their counsel, to indefinitely delay appellate review of sovereign immunity determinations, well outside of our Rules of Appellate Procedure, need to be recognized for what they are—a "voluntary and intentional surrender or relinquishment of a known right." *Greathouse*, 891 S.W.2d at 390.

It makes no difference that the Kentucky Department of Revenue (the Department) sought to have the trial court issue a new ruling regarding its right to sovereign immunity when it ruled upon class certification and specifically raised this denial as a basis for appellate review when it filed its notice of appeal regarding class certification.[27] Each of the medical defendants

---

[27] In the Department's responses to the plaintiff's motion for class certification in the medical case, it raised the issue of sovereign immunity. At the February 15, 2023, hearing on class certification, the Department acknowledged that the circuit court had previously ruled on the issue of sovereign immunity, that this was a final and appealable order, and that it had not been appealed. The Department nevertheless asserted that it had the right to raise the issue of sovereign immunity whenever it wanted and requested a new ruling on the issue. On March 28, 2023, the circuit court's order granting the plaintiffs' motion for class certification was entered. The circuit court did not address the Department's sovereign immunity issue. While a new ruling by the trial court on the issue of sovereign immunity may have given the Department another opportunity to

waived this issue by failing to file a timely notice of appeal after the trial court denied them immunity in its earlier separate order.

There is no provision in the RAP 3(A)(1)'s timeliness requirements providing an exception for permissible interlocutory appeals such as those taken from sovereign immunity determinations. There is no authority to suggest that permissible interlocutory appeals of denials of sovereign immunity are exempt from the time and jurisdictional limitations set forth in our rules. In *Prater*, 292 S.W.3d at 887, when we determined that parties may appeal a denial of immunity "immediately," it did not mean that an interlocutory appeal may be taken either immediately *or at any point in time thereafter at the pleasure of an appellant* (including bootstrapping it to another properly taken appeal).

Allowing the appeal of a denial of sovereign immunity at a later juncture invites gamesmanship. What is to prevent a party from filing a frivolous motion regarding arbitration so that it may obtain an untimely review of the denial of immunity? What is to prevent a party, who chose not to file a timely appeal after the judgment, from filing a frivolous CR 60.02 motion for relief simply to obtain consideration of a previously rejected and unappealed immunity defense?

The judiciary controls the process of litigation including interlocutory appeals, as recognized by statute, rather than the parties—even when one

---

file an interlocutory appeal on this issue, such a ruling never materialized and should not have been expected.

47

happens to be the state itself. Deferring to our executive agencies and governmental entities in such a manner upends the orderly process set out by our rules and vests ultimate control in such defendants to decide when they desire to appeal this issue. Essentially, we would be ceding our judicial power to make rules and control our process to the other branches of our government.

The majority creates a special rule which increases the power of governmental agencies and entities to allow them to file an appeal from any decision that denies them immunity at any time they choose. The majority opinion establishes no deadline for governmental entities to file an appeal from a court ruling denying their motions for immunity.

### D. The Rule Requiring Strict Compliance as to the Timing of Filing a Notice of Appeal should be Applied Fairly to All Parties.

Our Court has required strict compliance with filing deadlines against unsophisticated parties with much more at stake than merely money. Strict compliance lost a father the right to appeal from the termination of his parental rights where he timely e-filed with an explanation in the wrong case "envelope" involving the related dependency, neglect, and abuse case, where he could not e-file in the appropriate case. *Cabinet for Health & Family Servs. v. D.W.*, 680 S.W.3d 856, 859 (Ky. 2023). Strict compliance lost a defendant the right to appeal when the defendant mistakenly filed his timely notice of appeal with the Court of Appeals when it should have been filed before the circuit court. *Beard v. Commonwealth ex rel. Shaw*, 891 S.W.2d 382, 382 (Ky. 1994). Strict compliance lost a prisoner the right to appeal from the dismissal of a petition

for dissolution of marriage because the prison mailbox rule (which counts timeliness from when a document is delivered to prison officials for mailing) did not apply to an appeal of a civil action. *Willis v. Willis*, 361 S.W.3d 341, 344-45 (Ky. App. 2012).

It is neither fair, nor logical, to exempt sophisticated governmental parties with extensive experience asserting their immunity defenses from strict compliance regarding the timing of when they need to file their notices of appeal. If we can allow the fundamental right to raise one's own child to be stripped away based on the technicality of a timely appeal not being filed in the proper e-envelope (despite the fact that all parties received appropriate notice), how can we create and enshrine a special rule to allow a governmental entity to delay appealing the denial of immunity as a strategic choice? Simple logic dictates the fair enforcement of this jurisdictional rule against all parties.

### E. Resolution in this Case

It should be evident from the previous discussion that there is a lack of clear guidance from precedent on enforcement of our rules when it comes to resolving issues of sovereign immunity. I would not penalize the medical defendants for raising for our consideration in the present appeal the issue of whether the order denying them immunity was correctly decided and therefore would find the error harmless in this specific case. It is logical to resolve the immunity issue for both sets of defendants in these similar cases. However, having clarified the matter in the foregoing analysis, I would rule that henceforth, governmental defendants are required to file timely interlocutory

appeals from orders squarely denying their right to immunity or they will have waived their right to an examination of this issue in any forthcoming appeals, which will be strictly limited to the review of the issue upon which they timely filed.

**II. THE COMMONWEALTH'S UNFAIR DEBT COLLECTION PRACTICES MUST STOP.**

I am very troubled that the citizens of our Commonwealth were subjected to such unfair debt collection practices by the Department. The Department is a powerful agency granted extreme powers primarily to collect taxes due and owing, but its powers are tempered by appropriate legal safeguards designed to protect the rights of our citizens. While KRS 131.130(11) allows the Department to enter into agreements to "assume the collection duties for any debts due the state entity[,]" it is only authorized to collect "liquidated debt."

In collecting medical and education debts, the Department is functioning like a private collection agency. The debts here are "due" as only established by these institutions' own record keeping. The Department cannot use the power of the Commonwealth to seize private funds on behalf of third-party creditors to satisfy contested debts. Any collection by the Department must wait until the legitimacy of such debt has been conclusively resolved through a final judgment. Accordingly, having violated the authority given to it to collect state entity debt, the Department and the entities to whom it passed on the collected funds are not entitled to retain them.

As to the cost of medical care provided by the University of Kentucky (UK), it is well known that fees charged for UK's services vary widely based on

access to insurance and can be adjusted based on ability to pay and other factors. UK never should have been permitted to bypass the normal collection process and use the Department's collection arm to seize consumers' funds to compensate UK for their alleged debt. The General Assembly recognized such a fact by amending KRS 131.130 in 2022 to specifically prohibit, in sections eleven and twelve, the Department from collecting "consumer debt owed for health care goods and services" on behalf of state agencies.

The Medical Plaintiffs in their complaints agreed that they obtained treatment for themselves or their dependents (many of them went to the ER for emergency care), but argued they had a good basis for believing that they did not owe the money claimed due. These plaintiffs asserted they were qualified to participate UK's financial assistance program and/or that their insurance/Medicaid should have paid for the care they received from UK and/or that UK wrongly billed them for services which agreements with their insurance providers precluded being charged to them. These appear to be legitimate reasons to challenge the existence and the amount of debt due. Yet, according to their complaints, not only did UK fail to provide them with bills for an amount due (which would have allowed them to contest the amount owed, seek to have the charges reduced, or investigate whether their insurance companies had properly been billed), but their first notice of UK's claim that they owed on past due charges was when their funds were seized by the Department. The Medical Plaintiffs also claim that they were never provided

51

with an itemization of the amounts UK believed were due or given any opportunity to challenge the legitimacy of such claimed debt.

The Education Plaintiffs made similar claims in their complaints. Kimberly Bennett asserted that she was unilaterally re-enrolled for a semester without having registered or attended any classes and she should not owe any money for classes for which she did not elect to register or attend. Other students stated that while they did attend classes during periods for which the defendants claimed they owed a debt, they believed they did not owe any money to the colleges. They, like the Medical Plaintiffs, alleged that the first notice they received that they owed money was when their funds were seized by the Department, and they were not provided with any itemization of the amounts claimed due or an opportunity to challenge that they owed such amounts.

These claims from both sets of plaintiffs raise serious due process concerns which should give us pause. While the only question before us is whether sovereign immunity bars these suits from proceeding and prevents the defendants from being forced to disgorge the money taken from the plaintiffs, I would be remiss in not pointing out the significant hardship these plaintiffs were subjected to when the money they were relying on to pay for their bills was suddenly taken from them without any notice or opportunity to be heard. The majority of people whose funds were seized, like many Kentuckians, were living paycheck to paycheck. The seizure of funds from their accounts caused them hardship.

52

By using the power of the Department to bypass typical collection processes and directly seize their funds, the plaintiffs were subjected to potentially ruinous withholdings of their money with no immediate redress. Had the medical defendants and the educational defendants instead followed normal procedures and filed suit against the plaintiffs, the plaintiffs would have the opportunity to raise any available defenses. During such a lawsuit, even if it could be proved they owed the claimed debts, plaintiffs would have had the opportunity to seek bankruptcy protection prior to any judgment being reached and executed against them.

The educational plaintiffs were not precluded from discharging their educational debt because it was *not* "student loan debt"[28] but rather was ordinary debt which happened to be owed to a college by students. This claimed "student debt" simply reflected unpaid bills, fees, or outstanding tuition accounts; such consumer debt is fully dischargeable in bankruptcy.[29]

I agree with the Franklin Circuit Court's resolution of the sovereign immunity issue in both the "medical case" and in the "education case." Therefore, I dissent from the majority opinion's resolution of this issue and

---

[28] Student loan debt normally cannot be discharged under Chapter 11 bankruptcy unless "excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents[.]" 11 United States Code § 523(a)(8).

[29] *See* Matthew C. Welnicki, Esq. *Dischargeability of Students' Financial Obligations: Student Loans Versus Student Tuition Account Debts*, 31 J.C. & U.L. 665 (2005) (explaining the difference between these two kinds of debts).

would reverse the Court of Appeals' decision regarding sovereign immunity in both cases and affirm the circuit court.

I wholeheartedly agree with the circuit court's reasoning as to why sovereign immunity was not available to block the plaintiffs' suits against either group of defendants. I would hold that sovereign immunity is simply inapplicable where the defendants sought to illegally collect debts which were not reduced to judgment.

The circuit court resolved the issue of sovereign immunity regarding both the medical and education defendants via different routes of analysis but reached the same destination.[30] Key to its analysis in each case was that the Collection Statutes did not authorize the Department's actions to collect the plaintiffs' debt pursuant to KRS 45.241 if such debt is not liquidated as defined in KRS 45.241(1)(b)1 as "a legal debt for a sum certain which has been certified by an agency as final due and owing, all appeals and legal actions having been exhausted." The circuit court explained that in order to "liquidate" an account, the defendants were required to file a legal action in court and secure a final

---

[30] In the education case, the circuit court first concluded that the educational defendants were authorized under KRS 45.237 and KRS 45.238 to refer debts to the Department so long as such debts are "a sum certain which has been certified as due and owing." KRS 45.237(1)(d)1. In the medical case, the circuit court concluded:

> KRS 45.237 and KRS 45.238 are not general debt collection statutes. Instead, they are narrow in scope—providing a means for executive agencies to recover funds that an agency has "certified" to have improperly paid out, due to causes like error, fraud, and abuse. The statutes do not allow an agency to refer its ordinary trade accounts to the Department of Revenue.

54

judgment against each student/patient and concluded that the defendants had not yet liquidated their debts against the plaintiffs.

In the education case, the circuit court explained that KRS 131.565(6) contemplates a court action in which a state agency shall indemnify the Department for "any damages, court costs, attorneys fees and any other expenses related to litigation" and thus it and KRS 131.570 (which allows a tax payer to challenge a set off to an income tax refund) waive sovereign immunity. The circuit court also concluded that KRS 45.111 waives sovereign immunity as to claims for money that was improperly paid into the treasury. The circuit court explained that "Defendants have 'taken' the Plaintiffs' property here without first liquidating the debts and sovereign immunity does not apply." This reasoning is logical and provides an elegant solution to resolve this matter.

In the medical case, the circuit court relied upon *Ross v. Gross*, 188 S.W.2d 475, 477 (Ky. 1945), for the proposition that money which was unlawfully withheld never vested in the Commonwealth and had to be returned, and upon KRS 45.111 for a waiver of sovereign immunity as it provides a basis for a refund of funds not due the state: **"Any funds received into the State Treasury which are later determined not to be due to the state may be refunded to the person who paid such funds into the Treasury."** (Emphasis added).

Based on this authority, the circuit court concluded that funds which were unlawfully seized by the defendants through levies, refund offsets, and

55

agreement entered under duress were never vested with the state treasury because such funds always belonged to the plaintiffs. This reasoning is also a correct basis for concluding that sovereign immunity was waived.

Because the Department did not have the authority to collect the unliquidated debt of these plaintiffs, the funds collected never vested in the Commonwealth. Additionally, to a large extent the Department was simply used as a "pass through" to collect claimed debts which flowed to the hospital and the colleges; these funds never ended up in the state treasury, instead they ended up credited as receivables to these defendants. Accordingly, the Commonwealth could not assert sovereign immunity against a claim for a refund.

Therefore, while I agree with the majority opinion's conclusion that "sovereign immunity does not bar a monetary claim for a refund of funds from the State Treasury that were *never* due to the state[,]" I disagree that at this juncture that there can be *any* amounts "that were due to the state." It is simply impossible to conclude that any funds were due when the claimed debt was contested and never established pursuant to a judgment. Neither the amounts collected, which flowed through the Department to satisfy the claimed debt (to either the colleges for education debt or to UK for medical debt), nor the amounts collected which the Department claimed for its efforts in collecting such claimed debt, were authorized to be collected under the relevant statutes and, therefore, none of this money was due to the state. At most, there was an unliquidated claim that money was due, which could be pursued through

employing third-party debt collectors, but could not be forcibly extracted from the plaintiffs through the power of the Department in levying or garnishing the plaintiffs' paychecks, bank accounts, and tax refunds (or threating to do so if payment plans were not established). Therefore, all funds extracted from the plaintiffs by the Department (whether based on a claim that a certain sum was owed, late fees, interest, or costs related to the collection of such sums) were prematurely collected as not yet established as due and the ownership of such funds is still vested in the plaintiffs.

## III. CONCLUSION

I would concur in result only regarding allowing the medical case to be reviewed by this Court and make the rule henceforth going forward that interlocutory appeals from decisions denying sovereign immunity must be filed timely to comply with our RAPs.

As to the merits of the sovereign immunity defense regarding both sets of defendants, I would conclude that sovereign immunity is not an available defense for any of the defendants because the Department simply had no statutory authorization to collect non-liquidated debts. Therefore, the money the Department collected could not be "due the state" and instead remained vested in the plaintiffs. Accordingly, on remand, the circuit court would primarily be tasked with establishing what funds were collected from each plaintiff, ordering them returned, and determining what other sums are due to the plaintiffs.

CONLEY, J., CONCURRING IN PART AND DISSENTING IN PART:  I agree wholeheartedly with the opinion of Justice Thompson as to the applicability of RAP (3)(A)(1) to the issue of sovereign/governmental immunity for the medical defendants and their failure to timely file an interlocutory appeal on that issue. I must depart from him, however, as he correctly notes the issue is jurisdictional. RAP(2)(A)(2). The failure to timely file an appeal deprives a court of particular-case jurisdiction. Because the Court has no jurisdiction to consider the issue, we have no authority to conclusively determine whether immunity was properly granted or denied to the medical defendants. The trial court denied the medical defendants immunity; they failed to timely file an interlocutory appeal of that decision; therefore, it is controlling, and they must live with the consequences of their inaction.

As I have expressed elsewhere, for the judiciary "the power to act and the duty to act 'are inseparable: whenever a case calls for it, the call is imperative.' The converse is equally true—when there is no duty to act, there is no power to act." *Graham v. Secretary of State Michael Adams*, 684 S.W.3d 663, 707-08 (Ky. 2023) (Conley, J., dissenting) (quoting *Ex Parte Crane*, 30 U.S. 5 Pet. 190, 222, 8 L.Ed. 92 (1831) (Baldwin, J., dissenting)). Because we have no jurisdiction over the sovereign/governmental immunity question of the medical defendants I would forego any comment on the correctness of the trial court's ruling on that issue.

COUNSEL FOR AMELIA LONG, INDIVIDUALLY AND ON BEHALF OF A CLASS OF OTHERS SIMILARLY SITUATED; KAREN DEVIN, INDIVIDUALLY AND ON BEHALF OF A CLASS OF OTHERS SIMILARLY SITUATED; KAREN SAMSON; RICHARD HARDY, II, INDIVIDUALLY AND ON BEHALF OF A CLASS OF OTHERS SIMILARLY SITUATED; AND TABITHA MARCUM, INDIVIDUALLY AND ON BEHALF OF A CLASS OF OTHERS SIMILARLY SITUATED:

E. Douglas Richards

Bryan C. Hix
McNamara & Jones

Griffin Terry Sumner
Jason P. Renzelmann
Frost Brown Todd LLP


COUNSEL FOR COMMONWEALTH OF KENTUCKY, DEPARTMENT OF REVENUE:

R. Campbell Connell
Frank L. Dempsey
Austin T. Green
Department of Revenue


COUNSEL FOR UNIVERSITY OF KENTUCKY: PENNY COX IN HER OFFICIAL CAPACITY AS TREASURER, UNIVERSITY OF KENTUCKY:

Bryan H. Beauman
Carmine G. Iaccarino
Donald C. Morgan
Sturgill, Turner, Barker & Moloney, PLLC

William E. Thro
Shannan B. Stamper
University of Kentucky


COUNSEL FOR KIMBERLY BENNETT; BENJAMIN LANE; RONNIE LESTER, INDIVIDUALLY; AND SAYRE LAWRENCE:

E. Douglas Richards

Bryan C. Hix
McNamara & Jones

Griffin Terry Sumner
Jason P. Renzelmann
Frost Brown Todd LLP


COUNSEL FOR KENTUCKY COMMUNITY & TECHNICAL COLLEGE SYSTEM; AND TODD J. KILBURN, IN HIS OFFICIAL CAPACITY AS VICE PRESIDENT & CHIEF FINANCIAL OFFICER FOR KCTCS:

Melissa Norman Bork
Brent R. Baughman
Sarah T. Laren
Dentons Bingham Greenbaum LLP


COUNSEL FOR MOREHEAD STATE UNIVERISTY; THEIR RESPECTIVE TREASURERS IN THEIR OFFICIAL CAPACITIES; AND MARY FISTER-TUCKER, IN HER OFFICIAL CAPACITY AS CHIEF FINANCIAL OFFICER, MOREHEAD STATE UNIVERSITY

Bryan H. Beauman
Carmine G. Iaccarino
Kevin G. Henry
Sturgill, Turner, Barker & Moloney, PLLC


COUNSEL FOR MARK METCALF, IN HIS OFFICIAL CAPACITY AS TREASURER, COMMONWEALTH OF OF KENTUCKY

Brittany J. Warford
Sam P. Burchett


COUNSEL FOR AMICUS CURIAE, COMMONWEALTH OF KENTUCKY:

Russell M. Coleman
Attorney General

Matthew F. Kuhn
Solicitor General

John H. Heyburn
Principal Deputy Solicitor General